EVA GRAY

V.

CHAUNCEY B. WRIGHT

(No. 10833)

Submitted January 22, 1957. Decided February 26, 1957.

*Chad W. Ketchum, Tom T. Baker,* for plaintiff in error.

*Fitzpatrick, Marshall, Huddleston & Bolen, Amos A. Bolen, William C. Beatty,* for defendant in error.

RILEY, PRESIDENT:

In this action of trespass on the case instituted in the Circuit Court of Cabell County by the plaintiff, Eva Gray, against the defendant, Chauncey B. Wright, a physician practicing in Huntington, West Virginia, the plaintiff sought to recover damages for the alleged negligence of the defendant in failing to remove a hemostat from plaintiff's abdomen during the course of a gall bladder operation performed on plaintiff on June 16, 1947. The action was tried during the January, 1955, term of the Circuit Court of Cabell County before a jury under the defendant's plea of the general issue to plaintiff's special replication to the defendant's plea of the statute of limitations, with the result that the jury returned a verdict in favor of the plaintiff in the amount of twelve thousand dollars. On September 12, 1955, the circuit court entered an order sustaining defendant's motion that the court set aside the verdict, which order granted the defendant a new trial. To this order of September 12, 1955, the plaintiff prosecutes this writ of error.

In setting aside the verdict of the jury and awarding the defendant a new trial, the circuit court, as shown by its written memorandum of opinion, made a part of this record, was of the opinion that actual knowledge by the defendant physician that he had left a hemostat in plaintiff's abdomen during the course of the operation was a necessary fact to be established by proof in this action, in order to toll the one-year statute of limitations pro-

vided by Code, 55-2-12, as amended by Chapter 2, Acts of the Legislature, Regular Session, 1949.

The defendant, Dr. Chauncey B. Wright, had been engaged in the practice of general surgery in the City of Huntington since 1927. Pursuant to arrangements made by plaintiff's personal physician, Dr. Leland Dillon, defendant removed plaintiff's gall bladder on June 16, 1947, at St. Marys Hospital in Huntington.

From this record it appears that plaintiff, after suffering two gall bladder attacks, without having any medical attention, entered the hospital on June 8, 1947, under the care of Dr. Dillon. After the defendant Dr. Wright was consulted, at Dr. Dillon's suggestion, both agreed on the diagnosis that plaintiff had gallstones in her gall bladder, and that surgical removal of the gall bladder was necessary. A few days delay in performing the operation was caused by the plaintiff's mother's death, so that the operation was done on June 16, 1947.

On direct examination Mrs. Gray testified that prior to her first gall bladder attack some time in May, 1947, she was in "perfect health"; that she had been well prior to the gall bladder operation and had not been treated by any physician; that she had no prior high blood pressure or heart disease, gallstones or nervous condition; and that on June 8, 1947, the day she was admitted to St. Marys Hospital, was the first time she had ever been a patient in a hospital. On cross examination, however, she admitted that she had consulted Dr. Sanders Goodman in Huntington prior to her hospitalization in June, 1947, but denied that she had consulted Dr. Goodman for treatment for high blood pressure.

Notwithstanding the foregoing the plaintiff admitted on inquiry by her counsel that she had prior to her hospitalization in June, 1947, consulted Dr. Goodman at St. Marys Hospital, and had undergone certain tests at the hospital, which revealed a pathological gall bladder condition and the presence of gallstones.

Plaintiff's husband, John Gray, admitted that in

February, 1947, the plaintiff "had begun to go down hill"; that "her blood pressure was beginning to pick up"; and that plaintiff then entered St. Marys Hospital for a general check-up by Dr. Goodman.

The records of St. Marys Hospital, as presented by Sister M. Assumpta, who was in charge of the record department of that hospital, relating to operations performed, established the operation by the defendant, Dr. Chauncey Wright on June 16, 1947, as well as the operation performed at the hospital by Dr. H. Homer Cummings, Jr., the latter of which Dr. Cummings testified occurred "some time in March, either the latter part of March or the first of April, 1954", which latter date was less than a year before this action was tried.

The record of the hospital as to the removal of the hemostat from plaintiff's abdomen, which record Sister Assumpta testified was prepared by the doctor performing the operation, reads as follows: "The abdomen was prepared and draped with merthiolade. A transverse incision was made midway between the umbilicus and the xiphoid process. * * * The peritoneal cavity was opened without difficulty. Careful palpation revealed the presence of a firm object the size and shape of a seven inch hemostat. This object was completely covered by omentum with a portion of the hemostat bordering and being attached to the transverse colon which had crossed. By careful dissection the hemostat was removed in four pieces; one arm of the hemostat being attached, the other being fragmented, consisting of three fragments.

"The entire hemostat, though, was removed with no evidence of any foreign bodies being left behind. There was a terrific amount of reaction around the hemostat, areas of necrotic like material being covered by omentum. After removal of the foreign body, the wound was closed in layers with drainage."

Following the operation of June 16, 1947, plaintiff remained at St. Marys Hospital in Huntington for two weeks, during which time Dr. Wright visited her daily.

On the third day after the operation plaintiff was allowed to sit up in bed for the first time. According to her testimony and that of her husband, John Gray, she then experienced pain in her abdomen for the first time after the operation. She told Dr. Wright about these "sticking pains", and he replied, according to her testimony, that as she had been operated on she would be "sore and have all kinds of pains." Plaintiff's husband likewise testified in corroboration of the plaintiff as to the conversation between Dr. Wright and his wife three days after the operation.

The plaintiff testified that she continued to have pain in her abdomen, but that Dr. Wright informed her that such pain was the natural consequence of an operation such as she had had.

The record discloses that plaintiff's husband, John Gray, was with the plaintiff at the hospital almost continuously from the time of her operation on June 16, 1947, until her discharge on June 28, 1947; that he recalled only one time, that is three days after the operation, when plaintiff specifically complained to Dr. Wright of pain in her abdomen; and that there might have been a couple of other times when she complained. He also testified that Dr. Wright had expressed in his presence the opinion that the plaintiff was "doing fine"; that she would be "all right"; but that it would take some time for plaintiff to completely recover from an operation of that type.

After plaintiff was permitted to leave the hospital on June 28, 1947, she made three or four visits to Dr. Wright's office in Huntington before the defendant finally discharged her. Dr. Wright's records show that plaintiff made four visits to his office following the operation for post-operative care; and both plaintiff and her husband testified that on each occasion complaints of pain in her adbomen were made.

According to plaintiff, she told Dr. Wright on her first post-operative visit that she "still hurt in there";

and that he told her she would be all right. She testified that a week later she made a second visit to Dr. Wright's office and about the same conversation was had; that when she went to Dr. Wright's office for a final check-up she again told him that she had "that hurting in there", to which she testified defendant replied, "* * * He said I got along just fine. Which I did; I healed up well. And I thought I was all right."

Plaintiff's husband testified that he accompained the plaintiff to defendant's office on the occasions of her post-operative visits; and that on the occasion of the first post-operative visit plaintiff said, "Dr. Wright, I still have this hurting in here", to which he replied that the operation was all right, and "You just didn't get well after an operation in a week or two weeks or three weeks; that it took time." Plaintiff's husband further testified that about the same conversation took place on the occasions of their second and their final post-operative visits to defendant's office. He also testified in effect that Dr. Wright's reaction to his wife's complaint of pain in her abdomen appeared to be that he took the view the pain resulted from the operation itself; and he testified defendant told plaintiff "That you couldn't get - the way I would understand it, that an operation it takes quite some time, or a good while to get over them. You don't get over them in a day. And maybe I was just expecting too big results."

After having been discharged by Dr. Wright, defendant referred her to her family physician, Dr. Dillon, and plaintiff then did see Dr. Dillon and was in his care on and from August 4, 1947, for about two years following the operation, part of which time she saw and consulted Dr. Dillon about every two weeks and then once a month; and though plaintiff testified of telling Dr. Dillon about the pain in her abdomen, he treated her principally for high blood pressure. After being under the care of Dr. Dillon for the two years following her discharge by the defendant, the plaintiff then consulted and was treated by Dr. J. E. Ricketts for a period of about one and a half

years. She complained to Dr. Ricketts of pain in her abdomen, according to her testimony, but she testified that he treated her for high blood pressure.

Plaintiff then went to Dr. J. Russell Cook of Huntington, a physician specializing in internal medicine. She first consulted him about the middle of the year 1951, and continued under Dr. Cook's care until some time during the early part of the year 1954. To Dr. Cook plaintiff testified she complained of pain in her abdomen; but neither Dr. Dillon nor Dr. Ricketts had any record of or recollection of any complaint by Mrs. Gray of pain in her abdomen.

Dr. Cook was introduced as a witness for the plaintiff, and he told of his treatment of plaintiff for high blood pressure for a period of approximately a year and a half; and that on some occasion during this period of medical care the plaintiff complained to him of pain in her abdomen, and Dr. Cook's records show four such complaints; and further that there may have been complaints on other occasions. Specifically Dr. Cook testified: "I considered her abdominal complaints as a not uncommon complaint following gall-bladder surgery, in which soreness and discomfort at the site of the operation persist for some years afterwards. And not until she went to Cleveland did I know about the clamp"; that he thought little of those complaints; and that he did not make an X-ray of her abdomen, nor did he prescribe any medicine to allay the pain complained of.

In October, 1953, Dr. J. Russell Cook sent plaintiff to the Cleveland Clinic primarily for the purpose of determining whether plaintiff's high blood pressure might be alleviated through sympathectomy, which is surgical treatment diminishing blood pressure by the cutting of certain nerves in the patient's back. As a result of X-rays taken at the Cleveland Clinic the presence of the hemostat in plaintiff's abdomen was discovered, and plaintiff was advised to return to Huntington and undergo an operation both for a cancerous condition of plaintiff's breast and for the removal of the hemostat. As a

result an operation for the cancerous condition was performed by Dr. Homer Cummings, Jr., in October, 1953, and on March 4, 1954, Dr. Cummings removed the hemostat from plaintiff's abdomen.

Plaintiff was an obese person, which condition, as Dr. Cummings and Dr. Wright testified, greatly increased the difficulties in the performance of the gall bladder operation. That operation, the record discloses, requires the surgeon to use about sixty instruments, of which twenty-five or more are clamps. Dr. Cummings testified that the hemostat which he removed from plaintiff's abdomen had been used to clamp a bleeder, which, during the operation, had become covered by omentum (which is defined in Maloy, Medical Dictionary for Lawyers, Second Ed., page 425: "A fold or portion of the peritoneum which serves to connect and support the abdominal organs, blood vessels, etc. The great omentum forms a large sac which is attached to the stomach and the transverse colon. The lesser omentum connects the stomach and liver, and contains the hepatic (pertaining to the liver) blood vessels.") He also testified that it was the general practice in Huntington during the course of surgery to count only packs and needles after the operation, and not the instruments.

Dr. Wright testified that he did not know the hemostat had been left in the plaintiff's abdomen, and could not recall where it had been used; and that nothing was said by anyone during or after the operation which would indicate to him that the instrument had been left in the patient, nor did he hear about the hemostat having been left in plaintiff's abdomen until after plaintiff had gone to Cleveland Clinic in October, 1953. Plaintiff did not attempt to produce any evidence that Dr. Wright had left the instrument in her abdomen, but, on the contrary, she testified in answer to the question on cross examination: "Now, is it your contention here, Mrs. Gray, that Dr. Wright knew that instrument was in you, and deliberately left it", "No"; and plaintiff's own medical witness, Dr. J. Russell Cook, testified that he found

nothing in plaintiff's complaints during the course of his consultation with her, which was not common to gall bladder surgery.

From the foregoing recitals from the record it appears that the basic questions are: (1) Was actual fraud necessary to toll the statute of limitations prescribed by Code, 55-2-12, as amended by Chapter 2, Acts of the Legislature, Regular Session, 1949; and (2) does this record disclose that Dr. Wright in failing to discover and timely inform plaintiff of the presence of the hemostat in her abdomen guilty of such actual fraud?

We shall address ourselves *in seriatim* to these two questions.

The pertinent part of the statute relied upon by the plaintiff for the tolling of the one-year statute of limitations provided by Code, 55-2-12, as amended by Chapter 2, Acts of the Legislature, Regular Session, 1949, is contained in Code, 55-2-17, and reads in part as follows: "Where any such right as is mentioned in this article shall accrue against a person * * *, or by any other indirect ways or means, obstruct the prosecution of such right * * *, the time that such obstruction may have continued shall not be computed as any part of the time within the said right might or ought to have been prosecuted. * * *."

In *Baker* v. *Hendrix*, 126 W. Va. 37, 27 S. E. 2d 275, this Court held that mere silence by a guilty party is not such concealment as will prevent the running of the statute of limitations: in this jurisdiction there must be allegation and proof of facts sufficient in law to bring an act within the exception provided by this section.

Perhaps the leading case in this jurisdiction in which this Court applied the provisions of Code, 55-2-17, and in particular that provision which reads "or by any other indirect ways or means, obstruct the prosecution of such right", and held in point 8 of the syllabus of *Thompson et al.* v. *Whitaker Iron Co., et al.*, 41 W. Va. 574, 23 S. E. 795; 1 L.R.A. (N.S.) 1132N; 32 L.R.A.

(N.S.) 489N; 52 A. L. R. 144N, as follows: "Under section 18, chapter 104, Code, [Code, 55-2-17] it requires some positive - that is, affirmative - act by the defendant to operate under the clause, 'or by any other indirect ways or means, obstruct the prosecution of such right.' Merely silence will not do, but there must be some act designed to conceal the existence of liability, and operate in some way upon the plaintiff, and prevent or delay, suit for it."

In the *Baker* case, decided on certificate from the Circuit Court of Berkeley County, in an action at law instituted to recover damages for alleged malpractice, in which plaintiff's declaration alleges that defendant, a physician and surgeon, practicing in the City of Martinsburg, West Virginia, "performed an appendectomy upon plaintiff, during which he failed to remove a sponge or gauze, which defendant had intentionally placed there", the Circuit Court of Berkeley County had sustained a demurrer to plaintiff's replication, and this Court reversed the ruling of the Circuit Court of Berkeley County in sustaining such demurrer.

As the replication in the *Baker* case, though repetitious in many respects, alleges that the plaintiff had actual knowledge of the presence of the sponge or gauze in the incision when it was closed, this Court on certificate held that the replication was sufficient in law, and that actual knowledge or fraud or concealment after the original cause of action has arisen is necessary, under Code, 55-2-17, to toll the one-year statute of limitations provided for in Code, 55-2-12. In the *Baker* case on page 40 of the Official West Virginia Reports, it was stated: "Under Code, 55-2-12, such action 'shall be brought within one year next after the right to bring the same shall have accrued, and not thereafter', and the period of limitation is not enlarged or the operation of the statute suspended in the absence of fraud or an affirmative act on the part of the wrongdoer which is intended to and does conceal the wrong." After citing a number of decisions of this Court decided under the instant statute, this

Court, citing 2 Wood on Limitations (4th ed.), page 1422, said: "Mere silence by the guilty party is not such concealment as will prevent the running of the statute of limitations."

In *Pickett* v. *Aglinsky*, 110 F. 2d 628, the Circuit Court of Appeals for the Fourth Circuit, in applying the law as determined by this Court, as is the custom of Federal Courts to do in the application of well established rules of substantive law in state jurisdictions, applied the principle enunciated in the *Thompson* and *Baker* cases.

For a careful discussion of the question whether the operation of the statute of limitations in the Virginias may be suspended by the acts of the defendant in obstructing prosecution of an action, see 12 M. J., Limitations, Section 48; and for a full collation of authorities involving the question when a statute of limitations commences to run against actions against physicians, surgeons or dentists for malpractice, see generally *Schmit* v. *Esser*, 183 Minn. 354, 236 N.W. 622, 74 A. L. R. 1312, Note 1317 to 1325, inclusive; and *Hotelling* v. *Walther*, 169 Ore. 559, 130 P. 2d 944; also 41 Am. Jur., 233.

For the foregoing reasons we are of opinion that though the defendant, Dr. Chauncey B. Wright, may have been negligent in the first instance, a question not now before us, the cause of action against him accrued at the time of plaintiff's operation for the removal of gallstones, and, in the absence of actual knowledge, fraud, or concealment on the part of the defendant, which serves to toll the one-year statute of limitation, as required by the holdings of this Court in the *Thompson* and *Baker* cases, and by the express requirements of the statute itself, which provides *inter alia* for tolling of a statute of limitations when action by the plaintiff is prevented by the defendant, we are of opinion that the Circuit Court of Cabell County did not err in sustaining the defendant's motion to set aside the verdict of the jury, assessing plaintiff's damages in the amount of twelve thousand dollars, granting defendant a new trial,

and in entering the order of September 12, 1955, setting aside the verdict and awarding defendant a new trial.

We therefore affirm the judgment of the Circuit Court of Cabell County contained in its order of September 12, 1955.

*Affirmed.*