295 S.E.2d 1

**Joseph PENESCHI, et al.**

v.

**NATIONAL STEEL CORP., et al.**

v.

**KOPPERS CO., INC.**

**No. 15069.**

Supreme Court of Appeals of
West Virginia.

June 24, 1982.

Dissenting Opinion July 7, 1982.

Rehearing Denied Sept. 16, 1982.

McGraw, J., dissented and filed opinion.

512

Bogarad & Robertson and William R. Kiefer, Weirton, for appellants.

Frankovitch & Anetakis, Carl N. Frankovitch and George J. Anetakis, Weirton, for appellee National Steel Corp.

Donell, DeLaMater & Hagg and W. Dean DeLaMater, Weirton, for appellee Koppers Co., Inc.

Bachmann, Hess, Bachmann & Garden, John B. Garden and R. Noel Foreman, Wheeling, for appellee Hamilton.

Schrader, Stamp, Byrd, Byran, Johnson & Companion, Fred P. Stamp and James F. Companion, Wheeling, for appellee Yobe.

NEELY, Justice:

On 15 December 1972 Joseph Peneschi was an employee of Koppers Company, Inc., when a coke oven battery located on Browns Island in the Ohio River that Koppers was building for the National Steel Corporation exploded. Mr. Peneschi was standing on a water tank approximately one hundred feet from the explosion; he jumped from the tank and allegedly injured himself. Mr. Peneschi and his wife brought suit against the National Steel Corporation for negligence and against George V. Hamilton, Inc. and Yobe Electric, Inc., two sub-contractors of Koppers Company for negligence. National Steel Corporation filed a third-party complaint against Koppers Company, Inc., for indemnification under the construction contract between Koppers and National and in 1978, over five years after the injury, Mr. Peneschi sought to amend his complaint to assert a cause of action against Koppers, his employer, for intentional injury under *Mandolidis v. Elkins Industries,* 161 W.Va. 695, 246 S.E.2d 907 (1978).

The circuit court denied Mr. Peneschi's motion to amend his complaint to assert a cause of action against Koppers on the ground that the claim was barred by the two year tort statute of limitations. Furthermore, during the course of trial both George V. Hamilton, Inc. and Yobe Electric, Inc. were dismissed as parties because there was no evidence of negligence on their part. The case then went to the jury on the question of whether National Steel was negligent in causing the explosion and the jury returned a verdict for the defendant. It is from this jury verdict that the plaintiffs appeal. We affirm.

The defendant, National Steel Corporation, is a Delaware Corporation, operating in Weirton, Hancock County, West Virginia, as Weirton Steel Division. The Weirton Steel Division, a fully integrated steel-producing facility, decided to expand the coke-producing capacity of its plant by building a new coke facility on an undeveloped island in the Ohio River known as Browns Island. National Steel personnel met with representatives of Koppers to de-

velop preliminary specifications for a coke-producing facility and after these preliminary specifications were developed, National solicited competitive bids from companies engaged in the construction of coke ovens. Three bids were received by National, and Koppers was selected as the successful bidder.

Following the selection of Koppers to build the coke oven battery, representatives of Koppers and National met extensively to design the project. Koppers had blueprints and drawings prepared for each facet of the construction, and these drawings were inspected by representatives of National. National's representatives would either approve the drawings for construction or would suggest changes. The process of consultation on design and specifications continued as the project was being built.

It was anticipated that construction of the Browns Island coke oven battery would require twenty-four months. During this time several hundred construction workers were employed by Koppers and its sub-contractors to complete the project. At one point during the consultations on design a representative of National suggested the inclusion of a water spray device on a piece of equipment known as a preheater. A preheater is used to raise the temperature of fuel gas burned to heat the coke ovens in the battery. (The coke battery was designed to be heated by coke oven gas that is composed principally of methane and carbon dioxide and ignites at approximately 1500° F.) As the gas temperature is raised by the preheater, impurities are removed from the fuel gas. This process enables the fuel gas to burn more efficiently; however, the removal of such impurities results in those impurities accumulating as a type of a sludge in the preheater and related gas lines. The intended purpose of the water spray washing device was to eject a stream of water into the preheater to wash out these deposits. Through the floor on which the preheater was located, the water then drained at the base of the preheater from two, four-inch drain lines into the basement of the coke oven battery and entered an open pit.

Fuel gas was first introduced into the Browns Island coke battery in August 1972 and the process of heating-up the batteries continued until 15 December 1972, the date of the explosion. The fuel gas used to heat the batteries was produced by National at its mainland coke plant that was located in Hancock County, West Virginia, near the river bank across from Browns Island. The gas produced at that plant was pumped under pressure, through gas mains, across a bridge and onto Browns Island. There was a temporary reducing station at the point where the bridge touched down on Browns Island in order to regulate the pressure in the gas mains. From this point the fuel gas lines entered the basement of the Browns Island coke oven battery and made their way through that structure to the flues or burners.

On 15 December 1972 gas escaped from the preheater washing system (that had no warning or protective devices of any kind) and its attendant drain because the drains at the base of the heater were not closed. The pit into which the drain lines emptied did not have a continuously maintained level of liquid as a seal or lid, nor a vent pipe to carry any escaping gas. The explosion resulted.

Some time before the explosion, employees of National were assigned to Browns Island to learn the operation of the battery that was still under the control of the general contractor, Koppers. The plaintiffs alleged that the explosion was caused by negligence on the part of National's employees who were operating various pieces of equipment at the time of the explosion. The allegations in this regard, however, are immaterial to the appeal before us since the jury had all the evidence of active negligence before it and found for the defendant.

I

The primary issue that this Court must decide is the extent to which National is liable to the plaintiff on a theory of strict liability because National was engaged in an abnormally dangerous undertaking,

namely the accumulation and use of combustible gas for a private purpose. This issue causes us to confront squarely the question of the extent to which *Fletcher v. Rylands*, 3 H. & C. 774, 159 Eng.Rep. 737 (1865), *rev'd Fletcher v. Rylands*, L.R. 1 Ex. 265 (1866), *aff'd Rylands v. Fletcher*, L.R. 3 H.L. 330 (1868) is applicable in West Virginia today.

The basic principle of *Rylands* is that where a person chooses to use an abnormally dangerous instrumentality he is strictly liable without a showing of negligence for any injury proximately caused by that instrumentality. In the case before us, the plaintiff, Mr. Peneschi, was an employee of a contractor who had been engaged to work with the abnormally dangerous instrumentality and so we are asked to decide whether under these circumstances, where the employee has accepted employment under hazardous conditions, the employer of the independent contractor can be held liable on a strict liability, *Rylands*-type theory. We conclude that while an unrelated third party could recover against either Koppers or National on a strict liability, *Rylands*-type theory, an employee of either the general contractor or a sub-contractor who is hired to work under hazardous circumstances is barred from recovery on a strict liability theory. Following an overview of the *Rylands* doctrine, we will consider its history in this State.

The "rule" of *Rylands* is that "the defendant will be liable when he damages another by a thing or activity unduly dangerous and inappropriate to the place where it is maintained, in light of the character of that place and its surroundings." W. Prosser, *Law of Torts*, 508 (4th ed. 1971). Conditions and activities that are a "natural" use

of the land are not within the rule, such as water in household pipes, gasoline in a filling station, or a runaway horse. The case frequently has been misapplied, resulting in liability where anything under the defendant's control escapes and does damage.[1]

Even jurisdictions that reject *Rylands* by name have accepted and applied it under the cloak of various other theories, with strict liability commonly imposed under the sobriquet of "nuisance." Here too, the relationship of the activity to its surroundings is the controlling factor, so that using explosives in the midst of a city may be an absolute nuisance whereas in a wilderness it is not. "There is in fact probably no case applying *Rylands v. Fletcher* which is not duplicated in all essential respects by some American decision which proceeds on the theory of nuisance; and it is quite evident that under that name the principle is in reality universally accepted."[2] *Prosser, supra*, at 513.

Under the general American application of the *Rylands* doctrine, it is not required that the defendant intend for the damage to occur nor that the damage occur by his failure to follow a prescribed degree of care. "It has often been said that strict liability arises from conduct which is so far legitimate that it will not be enjoined, but it will make the defendant liable when it causes damage." *Prosser, supra*, at 495 n. 35. *Rylands* is not, in many regards, a doctrine of liability without fault. In terms of the comparative fault of the parties, the defendant acting for his own profit or pleasure is more at fault than the innocent plaintiff who has no part in the creation of the abnormal risk. Thus, the defendant's

---

**1.** Upon review, the House of Lords restricted the holding so that the strict liability principle was made to apply only to "non-natural" uses of the defendant's land, rather than "any purposes for which it might in the ordinary course of the enjoyment of the land be used." *Rylands v. Fletcher*, ALL E.R. 1–15 (1868). Through this limitation, the English Courts considered not only the character of the activity, but also the place and manner in which it was conducted in relation to its surroundings. *See* Stallybrass, *Dangerous Things and the Non-Natural User of Land,* 3 Camb. L.J. 376 (1929).

**2.** *See Wilson v. Phoenix Powder Mfg. Co.,* 40 W.Va. 413, 21 S.E. 1035 (1895). Syllabus point one of that case states: "A mill manufacturing powder and other explosives, and storing the same on the premises, situate on the bank of the Ohio river [*sic*] and near two railroads and a public road, is a public nuisance, and any one injured in property by explosion of powder stored there may recover damages without proof of negligence in its operation."

enterprise will be tolerated by the law, but it must pay its way by insuring the public against the injury it causes.

Where, for example, the defendant has elephants parachuting onto his farmland to entertain his family, he is acting for his own purposes, and is seeking a profit or benefit while creating an abnormal risk. Should the elephant's landing not be on target but rather on my roof, then I would be confounded if it were required that I prove either a negligent pilot or a defective parachute. That would be tantamount to asking about the negligence of the elephant. *Rylands* controls and clearly tells us where the liability lies.

The *Restatement (Second) of Torts*, § 519 (1976), has accepted the principle of *Rylands*, limiting it to "abnormally dangerous" activities with six factors to be balanced in determining whether an activity falls within the "abnormally dangerous" category, triggering strict liability. The factors are:

(a) existence of a high degree of risk of some harm to the person, land or chattels of others;

(b) likelihood that the harm that results from it will be great;

(c) inability to eliminate the risk by the exercise of reasonable care;

(d) extent to which the activity is not a matter of common usage;

(e) inappropriateness of the activity to the place where it is carried on; and

(f) extent to which its value to the community is outweighed by its dangerous attributes.

*Restatement (Second) of Torts*, § 520 (1976).

The general principle regarding abnormally dangerous activities as set forth in section 519 of the *Restatement* is qualified by its subsection (2): "This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous." That is, the rule of strict liability applies only to that harm which is within the scope of the abnormal risk upon which liability is based. The *Restatement* § 519 illustration is this:

A, with reasonable care, carries on blasting operations in a closely settled rural district. A has no reason to know of the presence of B's mink ranch nearby. The noise of the blasting frightens the mink and the fright causes them to kill their young. A is not subject to strict liability to B for the loss of the mink.

But if A has elephants parachuting onto his property, what type of damage possibly would be entirely unforeseeable?

*Rylands* was adopted in this State in *Weaver Mercantile Co. v. Thurmond*, 68 W.Va. 530, 70 S.E. 126 (1911). The plaintiff company occupied a building under a large wooden tank that the defendant used for supplying water to his hotel. When the tank burst and water flowed into the plaintiff's store, the defendant was held liable. Our Court began its analysis by referring to the doctrine of *res ipsa loquitur* but at the same time discussed *Rylands*-type situations.

No matter in what the negligence consisted, it is proved by the bursting of the tank. The rule, *res ipsa loquitur*, applies. If the person whose duty it was to keep the tank in good repair had not been negligent in some respect, the tank would not have burst. The negligent act may have been the failure to keep it properly painted, but it is not material what it was. Liability in cases like the present rests upon the principle that a man who erects a structure upon his premises which, because of neglect to take care of it, becomes a nuisance, either to the public or to the property of an adjoining owner, is liable. He is bound, at his peril, to prevent it from injuring the property of his neighbor.

68 W.Va. at 532, 70 S.E. 126.

The Court proceeded with the details of the *Rylands* case, and quoted it at length:

"We think that the true rule of law is that the person who for his own purposes brings on his lands and collects and keeps there anything likely to do mischief if it escapes must keep it in at his peril, and, if he does not do so, is *prima facie* answerable for all the damage which is the natural consequence of its

escape. He can excuse himself by shewing that the escape was owing to the plaintiff's default, or perhaps that the escape was the consequence of *vis major*, or the act of God; but, as nothing of this sort exists here, it is unnecessary to inquire what excuse would be sufficient. The general rule, as above stated, seems on principle just. The person whose grass or corn is eaten down by the escaping cattle of his neighbour, or whose mine is flooded by the water from his neighbour's reservoir, or whose cellar is invaded by the filth of his neighbour's privy, or whose habitation is made unhealthy by the fumes and noisome vapours of his neighbour's alkali works, is damnified without any fault of his own; and it seems but reasonable and just that the neighbour, who has brought something on his own property which was not naturally there, harmless to others so long as it is confined to his own property but which he knows to be mischievous if it gets on his neighbour's, should be obliged to make good the damage which ensues if he does not succeed in confining it to his own property. But for his act in bringing it there no mischief could have accrued, and it seems but just that he should at his peril keep it there so that no mischief may accrue, or answer for the natural and anticipated consequences. And upon authority this we think is established to be the law whether the things so brought be beasts, or water, or filth, or stenches."

68 W.Va. at 434–35, 70 S.E. 126.[3]

The Court in *Weaver* used *res ipsa* and *Rylands* language. Although confusion is created by this mixture, it is understandable because in *res ipsa* cases as well as in *Rylands*-type cases, negligence need not be proven. When we speak in *res ipsa* terms, we are speaking of negligence: be-

cause of the *res ipsa* rule of circumstantial evidence, negligence is presumed until the defendant rebuts the presumption. On the other hand, in *Rylands*-type cases, the basis of the liability is not negligence, but rather the defendant's intentional behavior in exposing others to a risk.

> It is conduct which does not so far depart from social standards as to fall within the traditional boundaries of negligence—usually because the advantages which it offers to the defendant and the community outweigh even the abnormal risk; but which is still so far socially unreasonable that the defendant is not allowed to carry it on without making good any actual harm which it does to his neighbors. *Prosser, supra,* at 494–95.

Thus, the very fact that a damage-causing event occurs suffices for liability under the *Rylands* doctrine. Similarly, in the absence of evidence to the contrary, in *res ipsa loquitur* cases, the mere fact that a damage-causing event occurs again suffices for liability.[4]

Soon after *Weaver, supra,* three cases followed that turned our adoption of *Rylands* into a quasi-adoption.[5] They indicate that a person in possession or control of an abnormally dangerous instrumentality is held to the highest degree of care, a standard commensurate with the dangerousness to be avoided. *See Morrison v. Appalachian Power Co.,* 75 W.Va. 608, 84 S.E. 506 (1915) (electricity); *Merrill v. Marietta Torpedo Co.,* 79 W.Va. 669, 92 S.E. 112 (1917) (explosives); and *McClain v. Marietta Torpedo Co.,* 84 W.Va. 139, 100 S.E. 87 (1919) (explosives). Consistent with those cases, negligence, via a "superior caution," was required in *Vaughan v. Miller Brothers "101" Ranch Wild West Show,* 109 W.Va. 170, 153 S.E. 289 (1930) where the abnormally dangerous instrumentality was an ape owned by a circus. (The circus

---

3. The Court was quoting the case at L.R. 1 Ex. 265. *See* footnote 1 of this opinion.

4. "Strict liability" does not mean that liability is absolute, although the terms "absolute liability" and "strict liability" are often used interchangeably. Defenses offered by the *Restatement (Second) of Torts* (1976) include § 519(2) discussed *supra* in the text, and § 523 (that plaintiff as-

sumed the risk). The public duty defense is discussed *infra* in the text. Of course, regardless of the standard of liability, plaintiff must still prove causation and damages.

5. "The term *quasi* is ... a weasel word, that sucks all the meaning of the word that follows ..." A. Corbin, *Corbin on Contracts* 27 (3d ed. 1952).

became a defendant when its ape left Vaughan with one less finger.) The plaintiff did not allege negligence, claiming that none was required, for "the gravamen of the action is not in the negligent keeping of a vicious animal, but in keeping it at all." *Vaughan,* 109 W.Va. at 171, 153 S.E. 289. While the Court recognized that much authority supported that position, it refused to follow it, stating "[i]t is certainly not consistent with the fundamental principles underlying actions for torts." *Vaughan,* 109 W.Va. at 172, 153 S.E. 289.[6]

Our Court again required proof of negligence in *Mayes v. Union Carbide Corp.,* 143 W.Va. 336, 101 S.E.2d 864 (1958). The defendant dam operator was held to a standard of ordinary care where the plaintiff's decedent drowned when the dam operator raised the gates and permitted water to rush unhindered into a watercourse where the decedent was fishing. In its analysis our Court considered *Weaver Mercantile Co., supra,* with another bursting-water-tank case in which proof of negligence was not required, *Wigal v. City of Parkersburg,* 74 W.Va. 25, 81 S.E. 554 (1914). Compared with these two was *Trump v. Bluefield Water Works & Improvement Co.,* 99 W.Va. 425, 129 S.E. 309 (1925), where the defendant was constructing a superimposed dam across a stream to impound waters for the use of the citizens of the town. The new construction prevented full operation of the drain from the old dam, and this resulted in flood waters flowing over the dam, damaging the plaintiff's premises. The Court in *Mayes* explained:

It is to be noted that the holdings in the *Weaver Mercantile Co.* case and the *Wigal* case impose on defendants liability regardless of proof of actual negligence, for the reason that persons who, for their own profit, bring onto their premises, and collect and keep there anything, which if it escapes, will do damage to another, are liable for all consequences of their acts, and are bound at their peril

to confine it and keep it on their own premises, while the liability of the defendant in the *Trump* case is based on negligence of defendant. A material difference in the facts justifies the different result. In the *Trump* case the defendant had the right, and perhaps a duty in some circumstances, to release waters from the impoundment into the natural channels of a stream, while no such corresponding right existed as to the defendants in the *Weaver Mercantile Co.* case or the *Wigal* case.

143 W.Va. at 340, 101 S.E.2d 864.

The *Mayes* decision followed *Trump* in requiring that negligence be proven as a condition precedent to recovery. The Court stressed the presence of authority to construct, maintain, and operate the dam, including the right to empty waters from the dam into the natural channel of the river. "This being true, it could not be held liable for every injury that might result from the release of waters from the dam." *Mayes,* 143 W.Va. at 342, 101 S.E.2d 864. Although the defendant in *Weaver* was a hotel owner who stored the water for his purposes alone, the defendant in *Wigal,* the city of Parkersburg, maintained the waterworks system for its inhabitants. Quite similar to the defendant in *Wigal,* the defendant in *Trump* was a public service corporation that supplied water to the city of Bluefield and its inhabitants.

The different standard of liability is not based on the presence or absence of a right to maintain an abnormally dangerous instrumentality. Even the defendant hotel operator in *Weaver* who acted solely for his own purposes had no less of a right to store the water than did the defendant dam operator in *Mayes* or the defendant public service corporation in *Trump.* A review of the *Restatement* factors explains the different results. While the Court may not have articulated its decisions in these cases in the language of the *Restatement,* it is obvious that the standard of liability was a

---

6. The application of strict liability for damages caused by animals might be logically included in the *Rylands* doctrine, but the two areas are handled in separate provisions of the *Restatement (Second) of Torts* (1976). Sections 504–

518 deal with the application of strict liability to animals. Sections 519–524A deal with the application of strict liability to abnormally dangerous activities. Many sections in one chapter correspond with sections in the other chapter.

function of the degree to which the benefits that flowed from the dangerous undertaking were either public or private in nature. We reiterate that the *Restatement* § 519(f) provides for consideration of the "extent to which its [the abnormally dangerous activity's] value to the community is outweighed by its dangerous attributes."

The *Rylands* doctrine was apparent again in *Whitney v. Ralph Myers Contracting Corp.*, 146 W.Va. 130, 118 S.E.2d 622 (1961), a case involving blasting that was undertaken in pursuance of a public duty. At syllabus point 2 this Court stated:

> The use of explosives in blasting operations, though necessary and lawfully used by a general contractor in the construction of a public highway, being intrinsically dangerous and extraordinarily hazardous, renders the contractor liable for damages resulting to the property of another from such blasting, without negligence on the part of the contractor.

This Court in *Whitney* incorrectly indicated that blasting is a unique kind of activity because one has "complete control" over blasting operations. If complete control were present, there would be no damages resulting in a lawsuit. But this Court quoted *Exner v. Sherman Power Construction Co.*, 54 F.2d 510, 514 (2d Cir. 1931):

> We can see no reason for imposing a different liability for the results of an explosion, whether the dynamite explodes when stored or when employed in blasting. To be sure there is greater likelihood of damage from blasting than from storage but in each case the explosion arises from an act connected with a business conducted for profit and fraught with substantial risk and possibility of the gravest consequences....
> 146 W.Va. at 136, 118 S.E.2d 622.

As this indicates, it is more reasonable to treat dynamite used in blasting in the same manner as dynamite that explodes when in storage than it is to put blasting in a category of its own.[7] In either case, handling dynamite (like having the ape, the elephant, or the water) is an *intentional* act. The blasting cases stand for the proposition that where an activity is sufficiently hazardous and the likelihood of harm to others so high as to be almost inevitable, even the pursuit of an urgent public purpose like road construction will not defeat *Rylands*-type strict liability with its attendant spreading of the risk among all who, like the users of our roads, benefit from the dangerous undertaking.

Subsequent blasting cases confirm the conclusion that West Virginia is among the majority of jurisdictions that have adopted the strict liability doctrine in blasting cases.[8] *Moore, Kelly & Reddish, Inc. v. Shannondale, Inc.*, 152 W.Va. 549, 165 S.E.2d 113 (1968), held that the use of explosives in blasting operations, though necessary and lawfully used by a contractor in the performance of a construction contract with a landowner, renders the contractor liable, without proof of actual negligence, for damages resulting from the blasting. "This Court is committed to the rule of absolute [strict] liability, whether the damage to the complaining party was caused by vibrations or by casting rocks or other debris on the complaining party's property." 152 W.Va. at 555, 165 S.E.2d 113. *See also Perdue v. S. J. Groves & Sons Co.*, 152 W.Va. 222, 161 S.E.2d 250 (1968). In the absence of strict liability, persons injured or damaged would be without a remedy unless they could show that the blaster was negligent in his blasting operations, *i.e.*, blasters would be allowed

---

**7.** *See also* footnote 2 of this opinion.

**8.** For an activity to be abnormally dangerous, it must also not be of common usage by the great mass of people in the community. The *Restatement* provides that even though blasting is recognized as a proper activity for building or clearing purposes, it is not carried on by any large percentage of the population and is, therefore, not a matter of common usage. Similarly, if the activity is inappropriate for the place in which it is carried on, it would be considered abnormal. Clearly, blasting in the middle of the desert, far from human habitation and all property of any considerable value, is not abnormally dangerous. Blasting in the midst of an urban or residential population, however, would be considered abnormally dangerous. *See Restatement (Second) of Torts* § 520 Comments i and j (1976).

to cause injury and damage to surrounding property so long as they do it carefully.

Although the blasting cases are clear, mixed language appeared again in *Adkins v. City of Hinton*, 149 W.Va. 613, 142 S.E.2d 889 (1965). The defendant city operated a refuse dump on such a steep incline that it created a hazard. A huge mound of debris broke away, slid like an avalanche into a hollow, and destroyed the plaintiff's realty and personalty. *Rylands* was recognized and the language for which it is now famous was quoted:

> "... persons who, for their own profit, bring onto their premises, and collect and keep there anything, which if it escapes, will do damage to another, are liable for all consequences of their acts, and are bound at their peril to confine it and keep it on their premises...." 149 W.Va. at 619, 142 S.E.2d 889.

However, *Rylands* was ultimately ignored as the Court focused on the overwhelming evidence of the city's negligence in maintaining and operating the facility. Perhaps because of this overwhelming evidence, the use of the *Rylands* alternative was simply determined unnecessary.

Our consideration of the history of *Rylands* in this State concludes with a very recent case. In *Smith v. City of Morgantown*, 169 W.Va. 668, 289 S.E.2d 223 (1982), the plaintiffs had recovered for damages that resulted from the breaking of a water main. This Court held that the trial court had erred in instructing the jury that the city was absolutely [strictly] liable. We relied on *Royal Furniture Co. v. City of Morgantown*, 164 W.Va. 400, 263 S.E.2d 878 (1980), where it was determined that negligence is the proper standard by which to measure liability for damages caused by water escaping from *public utility* mains.

The *Restatement (Second) of Torts* § 521 (1976) states: "The rules as to strict liability for abnormally dangerous activities do not apply if the activity is carried on in pursuance of a public duty imposed upon the actor as a public officer or employee or as a common carrier." We emphasize that this does not grant a total immunity but, rather, liability still arises if negligence is proven. Actually upon considering the six *Restatement* factors used to determine whether an activity is abnormally dangerous, we note that this is more aptly interpreted as an exception within the rule rather than an exception to the rule. What this Court actually did in *Smith* was apply *Rylands* as adopted by the *Restatement* with the public duty exception—an exception by the way that is greatly ameliorated by the availability in such cases of *res ipsa loquitur*. In *Smith*, 169 W.Va. at 670, 289 S.E.2d at 225, this Court quoted *Royal*, 164 W.Va. at 405, 263 S.E.2d at 882, that "[i]n no way does the application of *res ipsa* doctrine dispense with the requirement that negligence must be proved by him who alleges it." Standing alone this is clearly an incorrect statement of the law. But in *Royal* the Court continued in the next sentence to explain: "However, when the essentials of said doctrine are present, evidence of negligence is supplied."

When we view prior West Virginia cases addressing *Rylands*-type problems synoptically, it becomes obvious that our law has essentially applied the *Rylands* doctrine as articulated in the *Restatement (Second) of Torts* (1976). Accordingly, today we explicitly adopt *Rylands v. Fletcher, supra,* in this jurisdiction as it is presented in the *Restatement,* and we incorporate the functional criteria for determining *Rylands*-type liability, along with the exceptions articulated in the *Restatement,* into the common law of this jurisdiction.[9]

## II

There is a general principle of tort law that is succinctly stated in section 409, *Re-*

---

**9.** This decision in no way alters our decision in *Morningstar v. Black & Decker Mfg. Co.*, 162 W.Va. 857, 253 S.E.2d 666 (1979), not to adopt the *Rylands* doctrine into our tort product liability law. As we stated at 162 W.Va. 891–892, 253 S.E.2d at 684: "Its [the *Rylands* doctrine's] es-

sential characteristic is that the activity or object is abnormally or exceptionally dangerous.... In the ordinary product liability case, the product, if safely made, is not dangerous, but becomes so only by virtue of a defect."

*statement (Second) of Torts* (1976) as follows:

> Except as stated in §§ 410–429, the employer of an independent contractor is not liable for physical harm caused to another by an act or omission of the contractor or his servants.

Sections 410 through 429 of the *Restatement* then proceed to establish the myriad exceptions to the general rule. The position of the general rule *vis a vis* its exceptions is cogently analyzed in the reporter's comment to section 409 of the *Restatement:*

> The first departure from the old common law rule was in Bower v. Peate, 1 Q.B.D. 321 (1876), in which an employer was held liable when the foundation of the plaintiff's building was undermined by the contractor's excavation. Since that decision, the law has progressed by the recognition of a large number of "exceptions" to the "general rule." These exceptions are stated in §§ 410–429. They are so numerous, and they have so far eroded the "general rule," that it can now be said to be "general" only in the sense that it is applied where no good reason is found for departing from it. As was said in *Pacific Fire Ins. Co. v. Kenny Boiler & Mfg. Co.*, 201 Minn. 500, 277 N.W. 226 (1937), "Indeed it would be proper to say that the rule is now primarily important as a preamble to the catalog of its exceptions."

> The exceptions have developed, and have tended to be stated, very largely as particular detailed rules for particular situations, which are difficult to list completely, and few courts have attempted to state any broad principles governing them, or any very satisfactory summaries. In general, the exceptions may be said to fall into three very broad categories:

> 1. Negligence of the employer in selecting, instructing, or supervising the contractor.

> 2. Non-delegable duties of the employer, arising out of some relation toward the public or the particular plaintiff.

> 3. Work which is specially, peculiarly, or "inherently" dangerous.

The rule governing work that is specially, peculiarly, or "inherently" dangerous is set forth in section 427 A of the *Restatement:*

> One who employs an independent contractor to do work which the employer knows or has reason to know to involve an abnormally dangerous activity, is subject to liability to the same extent as the contractor for physical harm to others caused by the activity.

Again the comment to section 427 A explains the operative principle of the rule as well as it is possible to explain it:

> a. As to what is an abnormally dangerous activity, see §§ 519–524 A. The rules stated in those Sections are applicable to determine the liability of both the employer and the independent contractor.

> b. The principle underlying the rule stated in this Section is that one who employs an independent contractor to do work which the employer knows or has reason to know to involve an abnormally dangerous activity cannot be permitted to escape the responsibility for the abnormal danger created by the activity which he has set in motion, and so cannot delegate the responsibility for harm resulting to others to the contractor.

In the case before us the plaintiff offered an instruction that would have told the jury that if they found that National hired Koppers as an independent contractor to heat up the coke battery and that such work was abnormally dangerous in character, and as a result of the work an explosion occurred causing injuries to the plaintiff, they should find for the plaintiff. This instruction essentially set forth the *Rylands* cause of action and was refused by the trial court. We hold that this refusal was proper.

While we hold that the employer of an independent contractor cannot insulate himself from liability to third parties for the consequences of the use of abnormally dangerous instrumentalities by employing an independent contractor, we are unwilling to apply this rule to employees of

independent contractors where the contractor was expressly hired to work with or around an abnormally dangerous instrumentality.

A plaintiff who "assumes a risk" voluntarily encounters what is known to be a danger. (As a *caveat*, our reference to assumption of risk is context-specific. The *Restatement (Second) of Torts* § 523 (1976) recognizes it as a defense to abnormally dangerous activities and that makes sense in that context. Consideration of the defense in other contexts is left to another day.) *Restatement (Second) of Torts* § 523 (1976) provides as follows:

The plaintiff's assumption of the risk of harm from an abnormally dangerous activity bars his recovery for the harm.

Employees market their acceptance of a risk and are compensated for the damages involved in their employment through salary and other benefits. Thus, while an employee of a contractor may recover against the employer of that contractor for *negligence* that is the proximate cause of the employee's injury, we believe that the *Restatement* articulates the correct Rule concerning assumption of risk. Employers of contractors specifically hired to work with or around abnormally dangerous instrumentalities cannot be sued on a strict liability theory by the employees of the contractors. This comports with the *Restatement (Second) of Torts* § 523, Comment d (1976), which says:

d. The risk is commonly assumed by one who takes part in the activity himself, as a servant, an independent contractor, a member of a group carrying on a joint enterprise or as the employer of an independent contractor hired to carry on the activity or to do work that must necessarily involve it. Thus a plaintiff who accepts employment driving a tank truck full of nitroglycerin, with knowledge of the danger must be taken to assume the risk when he is injured by an explosion.

### III

Plaintiffs also assign as error the trial court's denial of their motion to amend the complaint to assert a cause of action against the third-party defendant, Koppers. Approximately five and a half years after suit was brought against National Steel and two of its sub-contractors the plaintiffs sought to amend their complaint to assert a cause of action against Koppers for intentional injury predicated on our holding in *Mandolidis v. Elkins Industries*, 161 W.Va. 695, 246 S.E.2d 907 (1978). *Mandolidis* appeared to expand the "intentional injury" exception to workmen's compensation immunity for employers. The plaintiffs in the case before us attempted to frame a cause of action within the *Mandolidis* holding. The trial court denied plaintiffs' motion for leave to amend their complaint under Rule *W. Va. R.C.P.* 15(c) on the grounds that the statute of limitations had run for a tort claim against Koppers.

Rule 15(c) provides:

*Relation back of amendments.—* Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading. An amendment changing the party against whom a claim is asserted relates back if the foregoing provision is satisfied and, within the period provided by law for commencing the action against him, the party to be brought in by amendment (1) has received such notice of the institution of the action that he will not be prejudiced in maintaining his defense on the merits, and (2) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against him.

The plaintiffs argue that since Koppers had been made a third-party defendant by National Steel in National's efforts to recover indemnification from Koppers in the event that plaintiffs recovered from National, Koppers had "such notice of the institution of the action that [it] will not be prejudiced in maintaining [its] defense on the merits, and ... knew or should have known that, but for a mistake concerning the identity of

the proper party, the action would have been brought against [it]."

We recognize that our Rule 15(a), in pertinent part, states that "leave [to amend] shall be freely given when justice so requires." Furthermore, we recognize that "[t]his Court is pledged to the principle that Rule 15 should be liberally construed," *Murredu v. Murredu,* 160 W.Va. 610, 236 S.E.2d 452, 459 (1977). But in this case Rule 15(c) is our *particular* concern. It expressly provides that an amendment that changes the parties *relates back* to the date of the original pleading, thereby avoiding the effect of the statute of limitations, if—*but only if*—certain conditions are satisfied. In view of this particular concern we cannot here rely on any general proposition (such as we quoted from *Murredu* ) or focus on the language of Rule 15(a), for although the objective of Rule 15 as a whole is to allow the liberal use of amendments to implement the policy of encouraging litigation on the merits, Rule 15(c) imposes restrictions in deference to the equally important purposes of the statute of limitations.[10]

In most of the federal cases involving amendments, the reason for changing the party against whom a claim has been asserted has been to change or correct a misnomer or misdescription of the party defendant named in the original complaint. 11 A.L.R. Fed. 269, 274 (1972).[11] Some courts have strictly construed the phrase "changing a party against whom a claim is asserted" to exclude amendments that add, rather than substitute, defendants. *See e.g., King v. Udall,* 266 F.Supp. 747 (D.Ct. D.C.1967). On the other hand, most courts have construed the phrase more liberally, to include additional as well as substituted parties. *See Note: Federal Rules of Civil Procedure 15(c): Relation Back of Amendments,* 57 Minn.L.Rev. 83, 106 note 78 (1972–73) (collecting cases).

*Note: Federal Rules of Civil Procedure 15(c): Relation Back of Amendments,* 57 Minn. L. Rev. 83, 106 note 78 (1972–73) (collecting cases).

■ As a general rule, where a plaintiff has not filed any type of claim against a third-party defendant, a requested "amendment" is tantamount to an original claim against the third-party defendant. *See, e.g., Horan v. Pope & Talbot, Inc.,* 119 F.Supp. 711 (E.D.Pa.1953); *Carlise v. Monongahela Railway Co.,* 16 F.R.D. 426 (W.D.Pa.1954); *Hankinson v. Pennsylvania Railroad Co.,* 160 F.Supp. 709 (E.D.Pa. 1958).[12] If, however, what precipitates the amendment is that a new cause of action was, in effect, *discovered* in the course of developing the original law suit, we have a different result. Where this is the case it would appear to be within the discretion of the trial court judge to determine whether the ends of justice are served by permitting the complaint to be amended to assert the new cause of action. Such a result is predicated on a "discovery" theory similar to our rule in medical malpractice cases that the statute of limitations does not begin to run until the injury is discovered or with due diligence should have been discovered by the plaintiff. *See Morgan v. Grace Hospital, Inc.,* 149 W.Va. 783, 144 S.E.2d 156 (1965); *Hill v. Clarke,* 161 W.Va. 258, 241 S.E.2d 572 (1978); *Bishop v. Byrne,* 265 F.Supp. 460 (S.D.W.Va.1967); *Harrison v. Seltzer,* 165 W.Va. 366, 268 S.E.2d 312 (1980).[13]

---

**10.** Our Rule 15(c) is identical to *Fed. R. Civ. P.* 15(c). The second sentence of our 15(c), *supra,* was added by order entered 1 June 1978, thereby following the 1966 addition/amendment to the federal rule.

**11.** Federal decisions interpreting Rule 15(c) have precedential value in West Virginia. *See, e.g., Plum v. Mitter,* 157 W.Va. 773, 204 S.E.2d 8 (1974).

**12.** Regarding the analysis in these cases, *see W. Va. R.C.P.* 14 and *Fed. R. Civ. P.* 14 as well as footnote eleven of this opinion.

**13.** Until *Morgan, supra,* the rule in our cases involving the negligence of surgeons in leaving foreign objects in the abdomens of patients was that unless the patient could prove by a preponderance of the evidence that the surgeon knowingly and fraudulently concealed the wrong from the patient, the period of limitation would run against the patient's cause of action from the date of the operation. Despite two prior decisions that offered an exact basis for the trial court's ruling, *Baker v. Hendrix,* 126 W.Va. 37, 27 S.E.2d 275 (1943), and *Gray v. Wright,* 142 W.Va. 490, 96 S.E.2d 671 (1957), this Court in *Morgan* adopted the rule that the period of the

**524**

In the case before us the plaintiffs were aware of the intentional injury exception to workmen's compensation immunity at the time this action was brought and chose not to assert a claim against the employer grounded on that theory. The plaintiffs' attempt to amend their complaint to assert a new cause of action against Koppers did not arise as a result of material discovered in the development of this law suit [14] but, rather, arose exclusively because it appeared to plaintiffs that this Court had expanded a cause of action. Nonetheless, the cause of action existed at the time the plaintiffs filed their original complaint and they were aware of all the facts that might have permitted recovery for an intentional injury within the two year statute of limitations. Consequently, we conclude that the trial court was correct in denying their request to amend their complaint.

## IV

During the course of trial the two independent contractors of Koppers, George V. Hamilton, Inc., and Yobe Electric Company, Inc. were dismissed as parties defendant because the trial court concluded that there was no evidence of negligence on their part. The plaintiffs' evidence of liability on the part of these two sub-contractors, viewed in the light most

---

applicable statute of limitations does not begin to run until the plaintiff learns of, or by the exercise of reasonable diligence should have learned of, the presence of the foreign object in her body, and thus overruled those two cases to the extent that they were inconsistent with the *Morgan* ruling.

In particular, in *Morgan* this Court emphasized the discovery of the foreign object rather than the duration of the pain suffered. The action was instituted more than ten years after the date of the performance of the surgery. This "discovery rule" was an application of the rule from our coal mining cases where the statute is held to run from the discovery of the wrong. Syllabus point four of *Petrelli v. West Virginia-Pittsburgh Coal Co.*, 86 W.Va. 607, 104 S.E. 103 (1920) was quoted in *Morgan*, 149 W.Va. at 788, 144 S.E.2d 156: "Where a cause of action accrues for the unlawful removal of coal by wrongfully extending mining operations into adjoining property, the statute of limitations begins to run only from the time of actual discovery of the trespass, or the time when discovery was reasonably possible." This Court in *Morgan* emphasized that the rule from *Petrelli* does not refer to knowledge, fraud or fraudulent concealment on the part of the defendant, and determined that to have such varying rules in the application of the statute of limitations in two strikingly similar types of cases would be inconsistent.

It is difficult to conceive why, in right, reason, or justice, one rule should apply when a defendant's wrong is concealed in the bowels of the earth and another, harsher rule should apply when the wrong has been concealed by the defendant surgeon in the bowels of a human being.... We believe that the two rules cannot, in reason and justice, be permitted to coexist in two situations of such similar and analogous nature.

149 W.Va. at 789, 144 S.E.2d 156.
We also note that we have applied the discovery rule to legal malpractice. *See Family Savings Loan, Inc. v. Ciccarello*, 157 W.Va. 983, 207 S.E.2d 157 (1974).

**14.** Our "discovery rule" perhaps is the theory behind the much discussed case of *Meredith v. United Airlines*, 41 F.R.D. 34 (S.D.Cal.1966), which was cited in the plaintiffs' and Koppers' briefs. In *Meredith*, the plaintiff was a passenger who suffered personal injuries from her United Air Lines' flight's near collision in mid-air with a military-type jet fighter plane. She filed her complaint in 1964 against United and the United States, charging the concurrent negligence of both. The plaintiff was unaware that shortly after the accident the Civil Aeronautics Board conducted an investigation, with the government contending that it had no military-type jet air craft operating anywhere near that location and that if a military-type plane were involved, it must have been one of two being operated in that general area by the civilian contractor, Lockheed, who was developing the aircraft and was conducting tests. The government was permitted to bring in Lockheed as a third-party defendant, seeking indemnification in the event that the government was held liable. The plaintiff moved to amend her complaint to name Lockheed as an additional defendant, and the motion was granted. Because the first effort to bring Lockheed into the case as a party defendant occurred after the statute of limitations had run on the original claim, Lockheed moved to dismiss the amended complaint.

In finding that the amended complaint would relate back to the date on which the original complaint was filed, the court held that the administrative inquiry had provided Lockheed with sufficient notice of the possibility of a claim. "Such knowledge leads to the inescapable conclusion that Lockheed also knew or should have known that, 'but for a mistake concerning the identity of the proper party, the action would have been brought against [it].'" *Meredith, supra*, at 38.

favorable to plaintiffs' case, demonstrated only that the sub-contractors had employees on the job site who *might* have been smoking and who *might* have ignited the gas that exploded. Consequently, under the evidence presented the ruling of the trial court dismissing the two sub-contractors as parties defendant was correct. *Wagner v. Sine*, 157 W.Va. 391, 201 S.E.2d 260 (1973).

### V

Plaintiffs assign as error the trial court's refusal to instruct the jury concerning the duty of a landowner to provide workmen with a safe place to work. To a large extent this jury instruction was but another way of expressing a *Rylands* cause of action since there is no evidence that the Browns Island plant was unsafe as a result of either active or passive negligence on the part of National. In fact, plaintiffs' own expert testified that there was no defect in the design at the coke battery and the evidence is conclusive that the employees on the construction site knew that gas was escaping and that a dangerous situation was developing.

Since National had no control whatsoever over the physical premises that were still under the management of Koppers as contractor there was no foundation for a jury instruction concerning a safe place to work. It has long been established in this State that an employer owes his employee the duty to exercise ordinary care that the employee's place of work be reasonably safe. *See, e.g., Purkey v. Southern Coal & Transportation Co.*, 57 W.Va. 595, 50 S.E. 755 (1905). But this is not a case where Koppers and its employees were brought into an existing National Steel plant to work and as a result of an unsafe condition in a plant that National controlled one of Koppers' employees was injured; in the case before us Koppers had been in exclusive control of the premises from the time construction on the plant began.

We find the plaintiffs' remaining assignments of error to be without merit.[15] Accordingly, for the reasons set forth above the judgment of the Circuit Court of Hancock County is affirmed.

Affirmed.

MILLER, C.J., deeming himself disqualified, did not participate in the consideration or decision of this case.

McGRAW, Justice, dissenting:

I do not quarrel with the majority's holding which adopts *Rylands v. Fletcher* strict liability as articulated in the *Restatement (Second) of Torts* into the common law of this jurisdiction. I also agree that assumption of the risk may be a valid defense in a strict liability situation. However, I dissent from that portion of the majority opinion which holds that the plaintiff herein assumed the risk of injury, as a matter of law, by virtue of his employer's contract with National Steel.

The defense of assumption of risk is narrowly confined and restricted by two requirements: "[F]irst, ... the plaintiff must know and understand the risk he is incurring, and second, ... his choice to incur it must be entirely free and voluntary." W. Prosser, *The Law of Torts* § 68 at 447 (4th ed. 1971). Thus, "before participation in the work will bar plaintiff's recovery, such participation must have been with the full realization ... of the risks ... and [the plaintiff] must have voluntarily incurred

---

**15.** Plaintiffs' remaining assignments of error are that the court erred in:

(1) denying motions to limit participation at trial by the third-party defendant;

(2) severing for trial the third-party complaint from the original claim;

(3) limiting the subject matter of the plaintiffs' examination of their expert witness;

(4) refusing to admit into evidence plaintiffs' exhibits concerning continuous gas monitoring devices;

(5) refusing to admit into evidence as an exhibit the contract between National Steel Corporation and Koppers Company, Inc.;

(6) permitting counsel for defendants to cross-examine Mr. Peneschi concerning his disability benefits;

(7) permitting cross-examination of Mr. Peneschi from interrogatories; and

(8) denying plaintiffs' motion for judgment not withstanding the verdict.

them." *McLane v. Northwest Natural Gas Co.*, 255 Or. 324, 338, 467 P.2d 635, 641 (1970). These issues are questions for the jury. *See, e.g., Lancaster v. Potomac Edison Co. of West Virginia*, 156 W.Va. 218, 192 S.E.2d 234 (1972); W. Prosser, *supra* § 79 at 524. They are not to be decided on appeal as a matter of law.

If, as a matter of policy, the majority wishes to relieve employers of independent contractors from strict liability for injuries to employees of the contractor caused by an abnormally dangerous instrumentality, they should simply say so, rather than attempting to justify their position by the misapplication of common law principles.