# Staunton

## C. P. DANIEL AND H. H. HARKRADER V. ALICE HARRIS KOSH.

September 13, 1939.

Record No. 2127.

Present, All the Justices.

The opinion states the case.

*Henry Roberts,* for the appellants.

*Jones & Woodward,* for the appellee.

HOLT, J., delivered the opinion of the court.

The plaintiff, Alice Harris Kosh, sued the defendants, Daniel and Harkrader, to enjoin the unloading and storing of gasoline near the plaintiff's dwelling house, and also for damages claimed to have been suffered because of the alleged nuisance.

The immediate occasion, if not indeed the sole reason, for the suit was the raising of the rate of fire insurance on the plaintiff's house and furniture, which raise was due mainly, if not entirely, to the unloading of the gasoline. While the bill contains brief averments to the effect that the plaintiff's person and property are in danger of serious injury from an explosion of the gasoline, the allegations as a whole show that the gravamen of her complaint is the increased cost of fire insurance consequent upon the unloading of the gasoline within 100 feet of her house.

According to the evidence the distance is approximately 70 feet. That this is the salient feature appears also from the prayer, which is that the defendants "be perpetually enjoined from unloading and/or storing gasoline on respondents' premises within one hundred feet of complainant's premises," and that the court determine what damages the plaintiff has sustained. It further appears, and even more definitely, from the following testimony given by the plaintiff on cross examination:

"Q. And it was only when they put the tank up there next to you that you objected?

"A. That is when they raised my insurance.

"Q. In other words, it was the raise in the insurance which raised your objection?

"A. Why sure, why wouldn't it?"

The trial court, after a full hearing, entered a decree denying the plaintiff injunctive relief but ordering the empaneling of a jury to find what was the fair market value of the plaintiff's property (a) if the defendants were permitted

to continue unloading gasoline within 100 feet of the plaintiff's dwelling house, and (b) if they were not so permitted. No jury, however, was actually empaneled, for the reason that at that stage of the litigation the defendants appealed from the decree.

In 1919 the plaintiff purchased the dwelling house in question, which is on Johnson street, in Bristol, Virginia. She paid $1,800 for the property, which comprises two lots, and has expended about $1,500 additional on it.

In 1929 the defendant, C. P. Daniel, purchased a coal yard, fronting 200 feet on Piedmont street and extending back to Johnson street, which is forty feet wide. The coal yard has on it a railroad spur track and a tipple. The Kosh residence is on the opposite side of the street.

The purchase price of the coal yard was $16,000. Shortly after acquiring it, Daniel built on it a gasoline retail filling station at a cost of approximately $7,500. This station began operations by a lessee from Daniel in 1930. In 1933 Daniel built on the property a second station and installed a carload gasoline storage tank at a cost of about $2,500. Later he built other equipment on the lot entailing an expenditure of about $750, thus bringing the total investment to approximately $26,250. The wholesale station has been operated by a lessee since December, 1933.

In February, 1936, the defendant, Harkrader, under an agreement with Daniel, also began a wholesale gasoline business on the latter's coal yard. Harkrader furnished his own storage tank, which is buried in the ground and is used for carload storage purposes. It is this station that seems to have been the chief cause of the present controversy.

The lessees unloaded 330 tank cars of gasoline during approximately three years following January, 1936. The amount of unloading varies somewhat with the season of the year, but, according to Mr. Daniel, averaged during the period mentioned somewhat more than two cars a week.

For some years prior to June 14, 1937, on which date the last policies expired, the plaintiff carried $3,000 of fire

insurance on her house and $1,000 on the furniture. The rate was 36 cents per hundred dollars of value. In 1936, due to the unloading of gasoline in tank car quantities on the Daniel property, and within 100 feet of the Kosh residence, the rate on the latter and its contents was increased to $1.36 per hundred. On that account the plaintiff discontinued carrying fire insurance on her house, testifying that she was unable to pay the increased rate. However, on cross examination she also testified that her husband earns from $30 to $40 per week, and that there are only three persons in the family.

Although rated by the insurance bureau as "apartments or dwellings," it appears from the evidence that the locality in question is predominantly industrial and commercial rather than residential. The presence of the railroad, and the shipping facilities thereby afforded, doubtless account for this in large measure.

The case has been prepared with diligence and argued extensively by counsel for the respective sides. However, the citations from this jurisdiction are cases relating to the construction or operation of steam and electric railroads, undertaking establishments, manufacturing plants, and the like. Such authorities bear upon the case at bar only indirectly and in a general way.

It seems settled law that a gasoline filling or storage station is not a nuisance *per se*. 46 C. J. 709; *City of Alexandria* v. *Texas Company*, 172 Va. 209, 1 S. E. (2d) 296; *City of Des Moines* v. *Manhattan Oil Co.*, 193 Iowa 1096, 184 N. W. 823, 188 N. W. 921, 23 A. L. R. 1322.

Where an alleged nuisance is not a nuisance *per se* the burden of proof is upon the plaintiff to show that it is a nuisance in fact. *Mears* v. *Colonial Beach*, 166 Va. 278, 184 S. E. 175.

There is a city ordinance which regulates in great detail the storage, handling and use of inflammable liquids and their products in Bristol. A copy of it was filed with the defendants' answer. Presumably, not to say evidently, the things here complained of are not prohibited by that ordi-

nance, since counsel for the plaintiff do not contend otherwise. Indeed, the evidence shows that the Harkrader tank was installed in strict conformity to the regulations of the National Board of Fire Underwriters; that the ordinance is a virtual copy of those regulations; and that Harkrader pays much the lowest rate of insurance of any gasoline handler in Bristol.

While a city ordinance is not the final test of the legality of a given act, *City of Alexandria* v. *Texas Company, supra,* the fact that the act is or is not forbidden by it does raise a presumption in the one case that it is harmful and in the other that it is innocuous, the municipality being regarded, at least *prima facie,* as competent to exercise a wise judgment in the matters to which the ordinance relates. This latter principle was recognized and enunciated by this court in *Elsner Bros.* v. *Hawkins,* 113 Va. 47, 50, 73 S. E. 479, 480, Ann. Cas. 1913D, 1278, where, in an opinion of the court by Harrison, J., it was said:

"The rule is generally recognized that municipal corporations are *prima facie* the sole judges respecting the necessity and reasonableness of their ordinances. Every intendment is to be made in favor of the lawfulness of the exercise of municipal power making regulations to promote the public health and safety, and it is not the province of the court, except in clear cases, to interfere with the exercise of the powers vested in municipalities for the promotion of the public safety."

That passage was quoted and the principle re-affirmed by this court in *Wood* v. *City of Richmond,* 148 Va. 400, 405, 138 S. E. 560, 562, and again in *Repass* v. *Town of Richlands,* 163 Va. 1112, 1115, 178 S. E. 3.

We concur in the view expressed by the United States Circuit Court of Appeals for the Eighth Circuit in *Hazlett* v. *Marland Refining Co.,* 30 F. (2d) 808, 810, a filling station case, where it is said:

"While the courts undoubtedly have jurisdiction in proper cases to afford relief, restrictions on the location of commercial establishments, such as these, should ordinarily, in

our opinion, be by zoning ordinance, and not by injunctive decree."

The following from the opinion in *Pennsylvania Co. For Insurance on Lives and Granting Annuities* v. *Sun Co.,* 290 Pa. 404, 138 A. 909, 910, 55 A. L. R. 873, also seems to us to be in point:

"In this age persons living in a community or neighborhood must subject their personal comfort to the commercial necessities of carrying on trade and business.

\*       \*       \*       \*       \*       \*       \*

■ "The wrong or injury resulting from the pursuit of a trade or business must be plainly manifest or certain to follow. If the injury be doubtful, eventual, or contingent, equity will not grant relief. The fact that it might possibly work injury is not sufficient."

Likewise the following from the opinion of the Court of Civil Appeals of Texas in *City of Electra* v. *Cross* (Tex. Civ. App.), 225 S. W. 795, 797:

"It seems to be well settled by the authorities that the construction and maintenance of a filling station, such as the one alleged in the petition, is not a nuisance *per se;* and counsel for the appellant in their argument do not deny that is the general rule of decisions. See authorities cited in note, 52 L. R. A. (N. S.) 930; 3 McQuillin Municipal Corporations, sec. 911."

That case was decided on a demurrer to the petition, the latter containing these allegations:

" \* \* \* that in order to carry on said business it will be necessary for said defendants to provide a large container for gasoline under the ground adjacent to said property, in which container there will be stored from time to time for sale hundreds and thousands of gallons of gasoline, which, if the same should become ignited and should explode, would necessarily work great havoc with persons and property and would necessarily wreck business buildings near thereto and would necessarily kill live stock and human beings traveling on, near or about said filling station in the event of an explosion; \* \* \* ."

Evidently addressing itself to the above somewhat lurid averments, the Texas court observed:

"To say the least, gasoline is used as a motive power almost as extensively as is steam. Unless properly insulated from flames, it will explode. But while in a general sense it may be termed an explosive and therefore dangerous, it does not follow that its storage in tanks of a filling station is necessarily so dangerous as to authorize the issuance of a writ of injunction to restrain such storage as is alleged in plaintiff's petition. It is a fact known to every one that it can be and is used with safety to propel motorcars and other kinds of machinery all over the land, notwithstanding the fact that while being so used it is kept in close proximity to sparks of fire which explode small quantities of the gasoline as it is fed from the receptacle in which the supply is contained. It is kept with safety in storage at filling stations in almost every town in the country."

In the present case there really is no very definite attempt to show that the operations on the defendants' property expose the plaintiff or her premises to serious hazard. Those operations had been conducted for quite some time without causing the plaintiff alarm, at least any to which she gave expression. It does appear, rather incidentally in the course of cross-examination, that she remonstrated with one of her neighbors, who, it seems, was given to emptying ashes near one of the gasoline tanks; but that is the only manifestation of uneasiness disclosed.

Nor, as regards the question of real increase of hazard, does anything more than qualified significance seem attachable to the fact of the marked increase in the insurance rate. It appears from the evidence of A. G. Osborne, a former special agent and inspector in the employ of the Virginia Insurance Rating Bureau, and who was called by the plaintiff, that the raise on any particular risk within the area covered by the raise may be largely arbitrary, since the rate for the area is based upon the *average* past experience of the underwriters in respect of all insured structures within

that area. This witness, referring to the Kosh residence, further testified:

"If I had been under the old schedule that I used to work under I would not have added the dollar to this because my common sense tells me that the risk is so elevated that it would have to be an explosion to damage the property, the flow of gas would be down hill and from the dwelling, but the rule says one hundred feet and it doesn't say whether it is up hill or down hill."

However, the witness, at a later point in his testimony, qualified the foregoing by saying:

"I think there is an increase in hazard if there is a leakage regardless of how the ground lays, there could be a little puddle or something; * * * ."

And in a letter written by the Chief Engineer of the rating bureau to Osborne, as Special Agent, it is stated:  ,

"The primary hazard involved is the unloading operations and the vapors therefrom, together with the possibility of flowing gasoline. Of course, in this instance, due to the distance and elevation, the flowing gas hazard would not appear to be serious. However, we feel that the charge as made is correct."

Regarding the matter of leakage, the plaintiff testified:

"Q. Do you ever notice any leakage of gasoline when the tank car is being unloaded?

"A. Yes, sir, I have seen them catch it in buckets.

"Q. Does that occur seldomly or frequently?

"A. I haven't noticed it since away long in the winter, but along in the winter it occurred frequently."

Counsel for the plaintiff have referred us to no case in which it was held that a mere increase in the insurance rate entitles the plaintiff to redress either in equity or at law, and we know of none. The authorities, indeed, are to the contrary. 29 Cyc. 1193. Furthermore, it is shown in the proof that certain other obviously permissible and possible structures and businesses, if built or conducted next door to the Kosh home, would cause very substantial raises in insurance rates on the latter over the 36 cents per hun-

dred formerly paid: If the adjoining place were occupied as a "beauty parlor" with three employees the rate on the Kosh residence would be 73 cents; if a boarding house of a certain number of rooms 90 cents; if a carpenter shop $1.33; and if a furniture repair shop $1.63. If no relief is given in the case of a "beauty parlor," which is not a commercial necessity and which sometimes is not needed at all and certainly was not in days that are gone, and if no relief can be given where a frame residence is built in a block where those of brick predominate, plainly none can be given in the instant case. An increase in insurance rates is no touch-stone.

It is contended that the unloading could be removed to a point more than 100 feet from the plaintiff's residence, and counsel cite *Whittemore* v. *Baxter Laundry Co.*, 181 Mich. 564, 148 N. W. 437, 52 L. R. A. (N. S.) 930, Ann. Cas. 1916C, 818. But the case cited seems to us to have presented a situation so materially different from the one here involved as hardly to be in point. In that case two gasoline tanks with a capacity of 10,000 gallons each were, in a spirit of tender consideration for the appearance of its own grounds and in disregard of the effect upon the plaintiff, about to be placed by the defendant laundry and dry cleaning concern within eleven feet of the plaintiff's house, although the evidence showed that there was abundant space on the defendant's premises for locating them much farther away. Whereas, in the case at bar the evidence tends to show that it is not reasonably practicable to remove the spur track and tipple, where the unloading takes place, to another location. Moreover, if unloading at a distance of 70 feet is not allowable, then it would be difficult to justify much of the ordinary unloading which, as a matter of common knowledge, takes place from tank motor trucks at retail filling stations, a commercial necessity universally recognized.

The method of marketing gasoline as here involved is, certainly in its general aspects and features, typical, and is a development of the times. It is not only con-

venient but necessary in the public interest.  Common observation shows that, at least as ordinarily conducted, these filling stations are not, in any practical or empirical sense, dangerous.  If otherwise, they would not abound to the extent they do.  The fact that the location or operation of such a station may sometimes affect adversely the property of others is not *per se* legal ground for complaint.  Rather, such facilities are to be regarded in the light of normal features of the life of today.  And, within reasonable limits, their objectionable elements are to be accepted with the same grace that is called for in the matter of zoning ordinances, building restrictions, traffic regulations and limitations upon the right to contract.  New conditions call for new concepts of private rights.  It has been said that a landowner's title extends to the remotest regions of the air; yet it would scarcely occur to him to charge an airplane pilot with trespass merely because he flew across his farm at a proper altitude.

We are in agreement, though, with the following observations made by the Supreme Court of New Mexico in its well-considered opinion in *Phillips* v. *Allingham*, 38 N. M. 361, 33 P. (2d) 910, 915:

"We realize the difficulties to be apprehended if a court seeks for its guidance a 'hard and fast' rule in cases of this kind.  The general principles controlling may be broadly stated, as has been done, but whether a given case falls within or without an application of those principles must be determined from 'the location, quantity, and other surrounding circumstances.' "

Moreover, the protection which the law accords such a business as the one in question is, of course, predicated upon an absence of negligence in its conduct.  Leakage, certainly in any volume, in unloading gasoline from tank cars should be avoided; and nothing in this opinion is to be taken as sanctioning such handling or as precluding the plaintiff from seeking redress should there be a recurrence of such leakage as is shown by the evidence to have taken place in the past at the station here involved; or should the station in any

other particular fail to be conducted with the high degree of care which the law rightly requires in respect of businesses of this character. The present decision is upon the basis of the state of facts disclosed in the record, and is to be construed in that sense.

On the whole case, and for the reasons stated, we conclude that the principle of *damnum absque injuria* rather than that of *sic utere tuo ut alienum non laedas* applies to it, and that the plaintiff was not entitled to prevail. The decree, therefore, must be reversed and the bill dismissed.

*Reversed.*