YOMMER, ET UX. *v.* McKENZIE, ET UX.

[No. 388, September Term, 1968.]

*Decided October 10, 1969.*

The cause was argued before HAMMOND, C. J., and MARBURY, BARNES, MCWILLIAMS, FINAN, SINGLEY and SMITH, JJ.

*John C. Sullivan* for appellants.

*Leslie J. Clark*, with whom was *Edward J. Ryan* on the brief, for appellees.

SINGLEY, J., delivered the opinion of the Court.

Mr. and Mrs. McKenzie, the plaintiffs below, live at Little Crossing in Garrett County. Their immediate neighbors are the defendants, Mr. and Mrs. Yommer, who operate a grocery store and gasoline filling station. On 17 December 1967, Mr. McKenzie noticed a "smell" in his well water which, on analysis, proved to be caused by the presence of gasoline in the well. McKenzie complained to Yommer, who arranged to have one of his storage tanks removed and replaced in January 1968. However, it was not until the McKenzies had a filter and water softener installed in April of 1968 that it was possible for them to use the water for cooking and bathing. At the time of the trial of the case in December of 1968 there was testimony that the McKenzies were still bring-

ing drinking water from Grantsville, about a mile distant.

The McKenzies, alleging a nuisance, sued the Yommers for damages and recovered a verdict of $3,500. The Yommers had moved for a directed verdict at the end of the plaintiffs' case and renewed their motion at the end of the entire case. The Yommers have appealed from the judgment entered on the verdict, assigning as error the trial court's refusal to direct a verdict in their favor. We shall affirm.

The thrust of the Yommers' argument is threefold: (i) that the establishment of a gasoline filling station does not constitute a nuisance; (ii) that the McKenzies failed to show that the damage they sustained was occasioned by the Yommers' negligence in the operation of the filling station; and (iii) that there was no proof that the McKenzies' well was contaminated by gasoline from the Yommers' tanks.

### (i)

We have previously held that the establishment of a gasoline filling station does not constitute a nuisance per se, *Smith v. Standard Oil Co.*, 149 Md. 61, 130 A. 181 (1925) but that it may become a nuisance because of its location or manner in which it is operated. *Adams v. Comm'rs of Trappe*, 204 Md. 165, 102 A. 2d 830 (1954); *Pocomoke City v. Standard Oil Co.*, 162 Md. 368, 159 A. 902 (1932). *See also Hendrickson v. Standard Oil Co.*, 126 Md. 577, 95 A. 153 (1915).

### (ii)

The argument that the McKenzies must prove negligence in order to recover fails to take into account the doctrine of strict liability imposed by the rule of *Rylands v. Fletcher* [1] which has been adopted by our prior decisions. *Susquehanna Fertilizer Co. v. Malone*, 73 Md. 268, 20 A. 900, 25 Am. St. Rep. 595 (1890); *Baltimore Brew-*

---

1. *Fletcher v. Rylands*, 3 H. & C. 774, 159 Eng. Rep. 737 (1865); *rev'd in Fletcher v. Rylands*, L.R. 1 Ex. 265 (1866); *aff'd in Rylands v. Fletcher*, L.R. 3 H.L. 330 (1868).

*eries Co. v. Ranstead,* 78 Md. 501, 28 A. 273, 27 L.R.A. 294 (1894); *compare with Toy v. Atlantic Gulf & Pacific Co.,* 176 Md. 197, 4 A. 2d 757 (1939). Dean Prosser states the rule of the English cases "[T]hat the defendant will be liable when he damages another by a thing or activity unduly dangerous and inappropriate to the place where it is maintained, in the light of the character of that place and its surroundings." Prosser, *Torts* (3d ed. 1964) § 77 at 522. *See also* Prosser, "The Principle of Rylands v. Fletcher" in "Selected Topics on the Law of Torts" (1953) at 135-190. Or, as Mr. Justice Sutherland put it in describing a nuisance in *Euclid v. Ambler Co.,* 272 U. S. 365, 388, 47 S. Ct. 114, 71 L. Ed. 303, 54 A.L.R. 1016 (1926), "[It is] merely a right thing in the wrong place—like a pig in the parlor instead of the barnyard."

Restatement, *Torts* (1938) § 519 at 41 relied on by the Yommers, limits the applicability of the rule of *Rylands v. Fletcher* to what it terms an "ultrahazardous activity" and incorporates a caveat, "The Institute expresses no opinion as to whether the construction and use of a large tank or artificial reservoir in which a large body of water or other fluid is collected is or is not an ultrahazardous activity." (at 44). Prosser, *Torts, supra,* § 77 at 527, is critical of the ultrahazardous activity concept which

> "* * * goes beyond the English rule in ignoring the relation of the activity to its surroundings, and falls short of it in the insistence on extreme danger and the impossibility of eliminating it with all possible care. The shift of emphasis is not at all reflected in the American cases, which have laid quite as much stress as the English ones upon the place where the thing is done."

Restatement, *Torts* 2d, for which Dean Prosser is the Reporter, § 519-520 at 52-68 (Tent. Draft No. 10, 1964) provides more guidance for us than its predecessor. For the "ultrahazardous activity" test an "abnormally dangerous activity" test has been substituted. The effect of

this change is to enlarge the circumstances under which the rule of strict liability will apply. As the Reporter pointed out to the American Law Institute:

> " 'Ultrahazardous,' as it is defined in the old Section, is misleading. There is probably no activity whatever, unless it be the use of atomic energy, which is not perfectly safe if the *utmost* care is used—which would of course include the choice of an absolutely safe place to carry it on." Restatement, *Torts* 2d, *supra,* Note to Institute at 57.

The black letter of new § 520 sets out the definition:

"520. *Abnormally Dangerous Activities*

In determining whether an activity is abnormally dangerous, the following factors are to be considered:

    (a) Whether the activity involves a high degree of risk of some harm to the person, land or chattels of others;
    (b) Whether the gravity of the harm which may result from it is likely to be great;
    (c) Whether the risk cannot be eliminated by the exercise of reasonable care;
    (d) Whether the activity is not a matter of common usage;
    (e) Whether the activity is inappropriate to the place where it is carried on; and
    (f) The value of the activity to the community."

We believe that the present case is clearly within the ambit of this definition. Although the operation of a gasoline station does not of itself involve "a high degree of risk of some harm to the person, land or chattels of others," the placing of a large underground gasoline tank in close proximity to the appellees' residence and well does involve such a risk, since it is not a matter of com-

mon usage.[2] The harm caused to the appellees was a serious one, and it may well have been worse if the contamination had not been detected promptly.

Although there is no evidence of negligence on the part of the Yommers (indeed such a showing is not required as will be discussed below), it is proper to surmise that this risk cannot, or at least was not, eliminated by the exercise of reasonable care.

The fifth and perhaps most crucial factor under the Institutes' guidelines as applied to this case is the appropriateness of the activity in the particular place where it is being carried on. No one would deny that gasoline stations as a rule do not present any particular danger to the community. However, when the operation of such activity involves the placing of a large tank adjacent to a well from which a family must draw its water for drinking, bathing and laundry, at least that aspect of the activity is inappropriate to the locale, even when equated to the value of the activity.

In the Reporter's notes concerning the new rule of the Restatement, he is careful to make a distinction which is applicable to this case. While in the first Restatement no position was taken on the issue of the storage of water and other liquids, Restatement, *Torts* 2d takes a different view:

> "The thing which stands out from the cases is that the important thing about the activity is not that it is extremely dangerous in itself, but that it is abnormally so in relation to its surroundings.
>
> ⁂ * ⁂
>
> "The same is true of the storage of gasoline, or other inflammable liquids, in large quantities. In a populated area this is a matter of

---

2. "An activity is a matter of common usage if it is customarily carried on by the great mass of mr • kind, or by many people in the community. * * * Gas and electricity in household pipes and wires [are examples of common usage], as contrasted with large gas storage tanks or high tension power lines." Restatement, *Torts* 2d, *supra*, comment on clause (d) at 65-66.

strict liability. [citing cases]. But in an isolated area it is not. [citing cases].

\* \* \*

"The same distinction is found in the cases of water stored in quantity, as in a reservoir. Rylands v. Fletcher was a case of a reservoir in Lancashire, which was primarily coal mining country; and the basis of the decision in the House of Lords was clearly that this was a 'non-natural' use of the particular land. \* \* \* Where water is stored in large quantity in [a] dangerous location in a city, there [h]as been strict liability. [citing cases]." Restatement, *Torts* 2d *supra,* Note to Institute at 57-58.

We accept the test of appropriateness as the proper one: that the unusual, the excessive, the extravagant, the bizarre [3] are likely to be non-natural uses which lead to strict liability.

This is precisely the distinction drawn by this Court, speaking through Judge Parke in *Toy v. Atlantic Gulf & Pacific Co.,* 176 Md. 197, 4 A. 2d 757 (1939) where our predecessors discussed the circumstances where the rule of *Rylands v. Fletcher* would be applied:

"The measure of duty thus imposed on the occupier of premises made him practically an insurer of his neighbors from such damage, and neither the absence of negligence on the part of the occupier nor the precaution taken was material to his liability. If carried to its logical consequences, the rule would impose grievous burdens as incident to the ownership of land, and therefore the courts have strictly limited the application of the rule. The basic concept underlying the rule is that a person who elects to keep or bring upon his land something which exposes the adjacent land or its owner or occu-

3. The language is Dean Prosser's, "Selected Topics on the Law of Torts," *supra,* at 146.

pant to an added danger should be obliged to prevent its doing damage. So, it follows that if the escape be of oil, gas, electricity, explosives, sewage or water artificially accumulated and stored and damage is done to an adjacent property, the occupier is within the rule. In these instances the occupier was not using the land in the common and natural way, and had artificially produced the potential danger whose presence and continuation may well be attributable to negligence, according to the relative circumstances, rather than to the doctrine of liability without fault." 176 Md. at 212-13.

It is apparent to us that the storage of large quantities of gasoline immediately adjacent to a private residence comes within this rule and relieved the McKenzies of the necessity of proving negligence. *See Berger v. Minneapolis Gaslight Co.,* 60 Minn. 296, 62 N. W. 336 (1895); *Sinclair Refining Co. v. Bennett,* 123 F. 2d 884 (6th Cir. 1941); but *compare Greene v. Spinning,* 48 S.W.2d 51 (Kansas City Ct. of App. 1932), which reached a contrary result.

### (iii)

The Yommers argue that there is no proof that it was gasoline from their tank which contaminated the McKenzies' well. There was testimony from which the jury could have found that the McKenzies' well was between 60 and 70 feet from the Yommers' 1,000 gallon tank; that the tank had been in place for about 20 years; that the level of McKenzies' well was below that of the tank; that when the tank was removed, there was evidence of seepage of gasoline under the tank; and that the dirt in the excavation smelled of gasoline.

The Yommers complain that the jury failed to consider testimony that tests made on the tank after it had been removed developed no evidence of a leak; that a second and smaller tank was pressure-tested in place with negative results; that in October of 1967 a 1,500 gallon tank

truck had spilled gasoline in West Grantsville, more than a mile from the McKenzies' home; and that there was evidence of seepage of gasoline and kerosene on the ground at another filling station some 300 feet from the McKenzies, on the opposite side of the road.

The answer to this contention is that the appeal reaches us not on exceptions to the court's instructions to the jury, but on the denial of a motion for a directed verdict for the defendants.

In determining whether the Yommers' motion for a directed verdict was properly denied, we must consider the evidence in a light most favorable to the McKenzies, resolving all conflicts in their favor and assuming the truth of all inferences which may be naturally and legitimately drawn from such evidence. *Wood v. Johnson,* 242 Md. 446, 219 A. 2d 231 (1966); *Grue v. Collins,* 237 Md. 150, 205 A. 2d 260 (1964); *Smith v. Bernfeld,* 226 Md. 400, 174 A. 2d 53 (1961). Such a motion should not be granted if there is any legally relevant and competent evidence from which a rational mind can infer a fact at issue. *Jacobson v. Julian,* 246 Md. 549, 229 A. 2d 108 (1967); *Plitt v. Greenberg,* 242 Md. 359, 219 A. 2d 237 (1966); *Smack v. Jackson,* 238 Md. 35, 207 A. 2d 511 (1965).

The gasoline had to come from somewhere. The jury could, and apparently did consider the fact that more than a mile and a river separated Grantsville, where the spillage occurred, from the McKenzies' residence and the testimony that dye added by the county Health Department to the seepage at the more distant filling station never appeared in the McKenzies' well.

Since there was evidence from which the jury could find that the Yommers' tank was the source of the contamination of the McKenzies' well, the motion was properly denied. We need not reach the question whether the motion was defective in failing to state its grounds. Maryland Rule 552 a.

*Judgment affirmed; costs to be paid by appellants.*