ARLINGTON FOREST ASSOCIATES,
Plaintiff,

v.

EXXON CORPORATION,
Defendant/Third–Party
Plaintiff,

v.

William T. BRYDEN, Third–
Party Defendant.

Civ. No. 91–0369–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Sept. 19, 1991.

Thomas Earl Patton, Schnader, Harrison, Segal and Lewis, Washington, D.C., for Arlington Forest Associates.

Mary Elizabeth Brobson, Piper & Marbury, Washington, D.C., for Exxon Corp.

## MEMORANDUM OPINION

ELLIS, District Judge.

This case presents the question, unresolved in Virginia, whether the storage and removal of gasoline in underground tanks is an "abnormally dangerous" activity for which strict liability should be imposed.

The matter is before the Court on defendant Exxon Corporation's ("Exxon") motion for partial summary judgment with respect to counts II (strict liability) and V (contractual indemnity) of the complaint. Exxon contends (1) that the storage and removal of gasoline in underground tanks are not abnormally dangerous activities and (2) that plaintiff Arlington Forest Associate's ("AFA") cannot recover under the indemnity provision of the lease for claims not instituted by a third party. For the reasons set forth here, the Court concludes that the Supreme Court of Virginia, if presented with the first question, would hold that storage and removal of gasoline in underground tanks is not an abnormally dangerous activity for which common law strict liability should be imposed.[1] The Court also finds that AFA falls outside the contract indemnity provision and hence is not entitled to its benefits. Exxon's motion for partial summary judgment must therefore be granted.

### Background

From 1947 to 1987, Exxon and its predecessor corporations leased a gasoline station located at 4831 N. First Street in Arlington, Virginia. Exxon and its predecessor corporations, in turn, subleased the station to independent operators, who operated the station and its equipment continuously during the lease period. Included in the station equipment were five underground gasoline storage tanks, four 2,000 gallon tanks dating from 1947, and one 4,000 gallon tank installed in 1957.[2]

In November of 1982, Exxon renewed a sublease with independent operator and codefendant William Bryden. The lease stipulated that Bryden allow Exxon to replace all the storage tanks. The tanks had not been removed when AFA purchased the property in 1983. Not until 1988, after the lease had expired, were the storage tanks finally removed.

In 1989, AFA discovered elevated concentrations of organic vapors in the property's subsurface soil. These findings reflect gasoline contamination of the soil. AFA contends that Exxon had been aware of gasoline leakage in the tanks since 1979, but had failed to remove them in time to prevent contamination of the property. AFA further maintains that the combination of tank age and soil conditions indicates a high likelihood that the tanks sustained serious corrosion damage leading to gasoline leakage. This leakage, according to AFA, is of special concern given the proximity of the service station property to a residential community. AFA alleges the property is approximately sixty feet from the nearest residential basement and one thousand feet from Lubber Run Creek, the nearest body of surface water. Based on

1. Not addressed in this opinion is the application here of statutory strict liability under Va. Code § 62.1–44.34:14 et seq. This Code provision establishes strict liability in certain circumstances involving the discharge or creation of a substantial threat of discharge of oil, including petroleum products, into state waters. The statute provides that the party discharging or creating the threat of discharge of oil shall be liable to "any person for injury or damage to person or property...." Va.Code § 62.1–44.-34:18(C)(4). "State waters" is broadly defined as "all water, on the surface and under the ground, wholly or partially within or bordering the Commonwealth or within its jurisdiction." Va.Code. § 62.1–44.3. Although AFA alleges

that the underground tanks were within 1000 feet of Lubber Run Creek, neither party has addressed the applicability here of this Code provision. The parties have been directed to submit briefs on this issue, which may be the subject of a further opinion, if appropriate.

Also not addressed in this opinion is the issue, raised by Exxon, of whether AFA has standing to assert common law strict liability. The Court need not reach this issue, as it has determined that common law strict liability does not apply to the facts of this case.

2. A sixth tank was subsequently installed to contain oil waste.

these facts, AFA contends that Exxon is strictly liable under Virginia common law for damages attributable to the gasoline leakage.

### Analysis

### Count II (Strict Liability)

██ The Supreme Court of Virginia has not squarely addressed whether the leakage of gasoline from underground storage tanks warrants the imposition of common law strict liability. In these circumstances, this Court's task is to divine what Virginia's highest court would conclude if faced with this question. *See Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *see also Commissioner v. Estate of Bosch*, 387 U.S. 456, 465, 87 S.Ct. 1776, 1782–83, 18 L.Ed.2d 886 (1967); *Bernhardt v. Polygraphic Co. of America*, 350 U.S. 198, 209, 76 S.Ct. 273, 279, 100 L.Ed. 199 (1956) (Frankfurter, J. concurring). This divination involves a two-step process. First, Virginia law must be examined to ascertain what rule or rules the Supreme Court of Virginia would likely use in analyzing and deciding the liability of a landowner or user for the storage and removal of gasoline in underground tanks on the property. The second step is the application of such rule or rules to the facts at bar.

The Court concludes that Virginia, consistent with other jurisdictions, would apply the Restatement (Second) of Torts §§ 519 and 520 as the liability standard in this context. Although unsettled in earlier Virginia cases, it is now established that Virginia recognizes the applicability of the doctrine of strict liability in certain circumstances. Equally well established is that the applicability of the doctrine in Virginia

is governed by §§ 519 and 520 of the Restatement. *See M.W. Worley Construction Co. v. Hungerford Inc.*, 215 Va. 377, 210 S.E.2d 161, 164 (1974) (adopting "the rule of absolute or strict liability for direct damage to neighboring property" in blasting cases and citing §§ 519 and 520). In reaching this conclusion, Virginia is in line with the growing majority of jurisdictions today.[3]

██ Strict liability attaches only to abnormally dangerous activities. This principle is embodied in § 519, which states in pertinent part that:

> [o]ne who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm. Restatement (Second) of Torts § 519(1).

The doctrine of strict liability derives from the notion that for certain abnormally dangerous activities the "one who conducts [it] should prepare in advance to bear the financial burden of harm proximately caused to others by such activity." C. Morris & C.R. Morris on Torts, Ch. IX at 231 (2d ed. 1980). *See also Sterling v. Velsicol Chemical Corp.*, 647 F.Supp. 303 (W.D.Tenn. 1986), *rev'd on other grounds*, 855 F.2d 1188 (6th Cir.1988) (compensatory damages awarded when chemical corporation was found strictly liable for contamination of residential water supply attributed to chemical leakage). "The liability arises out of the abnormal danger of the activity itself, and the risk that it creates, of harm to those in the vicinity." Restatement (Second) of Torts § 519 comment d. Thus, the abnormally dangerous activity "will be tolerated by the law, but [the company] must

---

**3.** Over thirty jurisdictions have approved of either the Restatement of Torts §§ 519 and 520 or their predecessor, the English case of *Rylands v. Fletcher*, (1865) 3 H & C 774, 159 Eng.Rep. 737. This number has been increasing "at a rate of one a year." W. Prosser, Torts § 78 at 549 (5th ed. 1984). *See also, e.g., Indiana Harbor Belt R. Co. v. American Cyanamid Co.*, 916 F.2d 1174 (7th Cir.1990); *City of Northglenn, Colorado v. Chevron U.S.A. Inc.*, 519 F.Supp. 515 (D.Colo. 1981); *Ruggeri v. Minnesota Mining and Manufacturing Co.*, 63 Ill.App.3d 525, 20 Ill.Dec. 467,

380 N.E.2d 445 (1978); *Yommer v. McKenzie*, 255 Md. 220, 257 A.2d 138 (1969); *Central Exploration Co. v. Gray*, 219 Miss. 757, 70 So.2d 33 (1954); *Berg v. Reaction Motors Division, Thiokol Chemical Corp.*, 37 N.J. 396, 181 A.2d 487 (1962); *Thigpen v. Skousen & Hise*, 64 N.M. 290, 327 P.2d 802 (1958); *Hudson v. Peavey Oil Co.*, 279 Or. 3, 566 P.2d 175 (1977); *Young v. Morrisey*, 285 S.C. 236, 329 S.E.2d 426 (1985); *Peneschi v. National Steel Corp.*, 170 W.Va. 511, 295 S.E.2d 1 (1982).

pay its way by insuring the public against the injury it causes." *Peneschi v. National Steel Corp.*, 170 W.Va. 511, 295 S.E.2d 1, 6 (1982).

§ 520 lists six factors to be assessed in determining whether an activity is abnormally dangerous:

(a) existence of a high degree of risk of some harm to the person, land or chattels of others;

(b) likelihood that the harm that results from it will be great;

(c) inability to eliminate the risk by exercise of reasonable care;

(d) extent to which the activity is not a matter of common usage;

(e) inappropriateness of the activity to the place where it is carried on; and

(f) extent to which its value to the community is outweighed by its dangerous attributes. Restatement (Second) of Torts § 520.

These factors are interrelated. Thus, a court should consider these factors as a whole, apportioning weight to each in accordance with the facts in evidence. *See* Restatement (Second) of Torts § 520 comment 1. And significantly, "[a]ny one of them is not necessarily sufficient of itself in a particular case, and ordinarily several of them will be required for strict liability." *Id.* comment f.

█ Central to the determination of whether an activity is abnormally dangerous is whether it could be made safe through the exercise of reasonable care. *See Philip Morris, Incorporated v. Emerson*, 235 Va. 380, 368 S.E.2d 268 (1988) (holding that strict liability would not apply to the disposal of the highly toxic chemical pentaborane, chiefly because such disposal could have been conducted safely if reasonable precautions had been taken); *see also Hudson v. Peavey Oil Company*, 279 Or. 3, 566 P.2d 175 (1977) (no strict liability where evidence did not show that the risk of seepage from underground gasoline tanks could not be eliminated by reasonable care). This test, expressed in § 520(c), does not contemplate that all risk be capable of elimination by due care. Absolute safety is not required. Rather, the risk must be reducible by due care to a point where the likelihood of harm is no longer high.[4] *See New Meadows Holding Co. by Raugust v. Washington Water Power Company*, 102 Wash.2d 495, 687 P.2d 212 (1984) (noting, in denying strict liability for leakage from natural gas lines, that § 520(c) is concerned with the capacity to eliminate high degrees of risk and that some degree of risk will always be present). If an activity can be performed safely with ordinary care, negligence serves both as an adequate remedy for injury and a sufficient deterrent to carelessness. Strict liability is reserved for selected uncommon and extraordinarily dangerous activities for which negligence is an inadequate deterrent or remedy.

Maintained, monitored, and used with due care, underground gasoline storage tanks present virtually no risk of injury from seepage of their contents. They are not abnormally dangerous. Sound tanks, timely replacement of impaired tanks, modern corrosion control techniques, and adequate testing for leakage can eliminate all but a tolerably small amount risk.[5] The injury alleged in this case apparently oc-

---

4. The language of § 520(c) is somewhat ambiguous. A straight-forward reading of the text suggests that the phrases "it will be great" in § 520(b) and "the risk" in § 520(c) refer back to the "high degree of risk of some harm" in § 520(a). Thus, in § 520(c), it is only the "high degree of risk" that must be capable of elimination by the exercise of reasonable care.

5. In other contexts, the Supreme Court of Virginia has long recognized that gasoline service stations are not inherently dangerous operations. In *Daniel v. Kosh*, 173 Va. 352, 4 S.E.2d 381 (1939), a nuisance action, the Court noted that "[c]ommon observation shows that, at least as ordinarily conducted, these filling stations are not, in any practical or empirical sense, dangerous. If otherwise, they would not abound to the extent they do." 4 S.E.2d at 385. In a 1957 zoning case, the Court observed that "[i]n light of changing times and modern methods in the handling of petroleum products we cannot say that the operation of a gasoline service station is an inherently dangerous business." *City of Winchester v. Glover*, 199 Va. 70, 97 S.E.2d 661, 663 (1957), *rev'd on other grounds, Byrum v. Bd. of Supervisors*, 225 S.E.2d 369 (Va.1976). Advances in technology and safety standards continue to enhance safety.

curred because the tanks fell into a preventable state of disrepair. Only those activities that remain dangerous despite the exercise of all reasonable precautions warrant imposition of strict liability. Here, reasonable precautions would have sufficed to prevent the harm.

That strict liability is inapplicable in this case is bolstered by the factors enumerated in § 520(d) and (e). Under § 520(d), an activity may involve inherent risks of harm and still not be considered abnormally dangerous if the activity is a matter of common usage. *See* Restatement (Second) of Torts § 520 comment i. Comment i defines common usage as "customarily carried on by the great mass of mankind or by many people in the community." To be sure, the specific activity of storing and removing gasoline from commercial underground gasoline storage tanks is not carried on by the "great mass of mankind." Yet the presence and use of filling stations in and near residential areas is widespread and routine. In fact, filling stations with underground tanks are commonplace in most communities throughout the country. Every town, hamlet, or neighborhood has one, if not many. Populous areas typically support several in close proximity. Some dangerous activities are so generally carried on as to be regarded as customary. For example, in *New Meadows Holding Co.*, the Supreme Court of Washington held that the transmission of natural gas is a matter of common usage. The court based its conclusion on the following facts: approximately 160 million people use gas for residential needs; about thirty-five percent of the total energy used by industry is provided by natural gas; and roughly 720,-900 miles of distribution pipelines crisscross communities nationwide. 687 P.2d at 216. Despite the fact that the specific form of gas transmission at issue in *New Meadows Holding Co.* was being conducted by a large utility company and not by individuals, the court nevertheless concluded that the activity was a matter of common usage. Similarly, although gasoline service stations may not themselves be operated by "the great mass of mankind," they are so pervasive as reasonably to be considered "matters of common usage."

Section 520(e) considers the appropriateness of an activity to its location. *See Peneschi*, 170 W.Va. 511, 295 S.E.2d 1 (holding that the controlling factor in applying strict liability is the relationship of the activity to its surroundings). The more appropriate an activity is to its setting, the less likely it is to be considered abnormally dangerous. Clearly, filling stations are very appropriate in and near residential areas. They provide residents with necessary, desired, and convenient sources of fuel for their vehicles. Nothing in this case suggests that the station formerly situated on AFA's property was any less appropriate to its location than the average neighborhood service station.

Thus, considering the interrelated factors of § 520 as a whole and apportioning special weight to those factors most pertinent to the facts presented by this case, this Court concludes that under Virginia law, underground gasoline storage tanks are not abnormally dangerous. Common law strict liability does not apply. The result reached here is consistent with decisions of the Supreme Court of Virginia that apply strict liability narrowly. The court has allowed strict liability in blasting cases because of the unpredictability of the danger associated with even the most cautious blasting. *Worley*, 210 S.E.2d at 163; *Laughon & Johnson, Inc. v. Burch*, 222 Va. 200, 278 S.E.2d 856 (1981). The supreme court has, however, held not inherently or abnormally dangerous activities involving disposal of pentaborane, *Philip Morris, Incorporated*, 235 Va. 380, 368 S.E.2d 268; transmission of steam, *Norfolk and Western Railway Company v. Johnson*, 207 Va. 980, 154 S.E.2d 134, *cert. denied*, 389 U.S. 995, 88 S.Ct. 498, 19 L.Ed.2d 491 (1967); operation of a sawmill, *Epperson v. DeJarnette*, 164 Va. 482, 180 S.E. 412 (1935); erection of a building, *Richmond v. Sitterding*, 101 Va. 354, 43 S.E. 562 (1903); and construction of a bridge, *Bibb's Adm'r v. N. & W. R.R. Co.*, 87 Va. 711, 14 S.E. 163

(1891).[6] The risk of harm from a gasoline station storage tank is certainly no greater than the risk from many of these activities. Certainly the risk is significantly less than that associated with the disposal of pentaborane, a chemical so toxic that even slight exposure to its fumes may be fatal. Yet the Supreme Court of Virginia declined to extend strict liability to even this plainly perilous activity. *Philip Morris, Incorporated,* 368 S.E.2d 268.

Courts in other jurisdictions have reached the same conclusion. *See Peneschi,* 295 S.E.2d at 5 (gasoline storage in a filling station is a "natural use of the land" and is not unduly dangerous for purposes of strict liability); *Hudson,* 566 P.2d at 177 (strict liability denied where the evidence did not conclusively show that the harm to be anticipated from underground seepage of gasoline was grave or that the risk of seepage could not be eliminated by the exercise of reasonable care).

Two courts have reached the opposite result. In *City of Northglenn, Colorado v. Chevron U.S.A. Inc.,* 519 F.Supp. 515 (D.Colo.1981), the court applied strict liability to the underground storage of several thousand gallons of gasoline in a suburban area, finding that the widespread use of gasoline did not diminish its inherently dangerous character. In *Yommer v. McKenzie,* 255 Md. 220, 257 A.2d 138 (1969), the court held that strict liability was available for underground gasoline tanks in close proximity to a residence and well, asserting that the usage was not common. Neither *Northglenn* nor *Yommer* is persuasive here because both decisions fail to accord sufficient weight to the potential for reasonable care to mitigate the risk of injury.

AFA argues that characterizing the activity in this case as the storage and removal of gasoline in underground tanks is erroneous and asserts that the activity ought to be more particularly described as the storage of gasoline in *moribund* underground tanks. AFA suggests, no doubt correctly,

that storing gasoline in *moribund* tanks cannot be made safe except by ceasing such activity entirely. In other words, AFA's position is that no amount of reasonable care can make moribund tanks safe. AFA therefore contends that such activity is abnormally dangerous under § 520 and should give rise to strict liability.

■ AFA misconstrues the definition of "abnormally dangerous." An activity is abnormally dangerous if it is "dangerous in its normal or nondefective state." *Fallon v. Indian Trail School,* 148 Ill.App.3d 931, 102 Ill.Dec. 479, 481, 500 N.E.2d 101, 103 (1986), *appeal denied,* 114 Ill.2d 544, 108 Ill.Dec. 416, 508 N.E.2d 727 (1987) (denying strict liability for use of a trampoline). For strict liability purposes, the danger cannot be predicated on "mere causal or collateral negligence of others with respect to [the activity] under the particular circumstances." *Id.* Here, the moribund condition of the tanks is a particular circumstance indicative of negligence or defect. It is not the normal or nondefective condition of underground tanks.

AFA's particularized approach to defining the nature of an activity would, in effect, enable plaintiffs to invoke strict liability for all negligently-conducted activity. Performing a dangerous activity in a negligent manner cannot be made safe except by ceasing to behave negligently. Any plaintiff in a negligence action could simply characterize the offending behavior as incapable of being safely performed even with due care, thus bringing it within the scope of strict liability. For example, the activity of "driving a car" can be made sufficiently safe by the exercise of reasonable care. But "driving a car at an excessive rate of speed" cannot be made safe except by ceasing to drive too fast. Clearly this approach would extend the reaches of strict liability far beyond the bounds of the law and of common sense. The Court does not doubt that the injury inflicted in this case stems from the presence of mori-

---

**6.** In addition, the federal court in the Western District of Virginia has held that Virginia law would not consider the operation of a railroad an ultrahazardous or abnormally dangerous activity to which strict liability applied. *Warner v. Norfolk & Western Railway Co.,* 758 F.Supp. 370 (W.D.Va.1991).

bund storage tanks; however, this fact properly relates to the issue of negligence.

Certain activities cannot be made safe by due care. Where society is unwilling to assume the additional risk of injury, strict liability is imposed to shift the costs of the additional risk to the party conducting and benefiting from the dangerous activity. Where risk of harm can be avoided by reasonable care, a sufficient remedy exists in negligence. The refusal to extend strict liability to the storage and removal of gasoline from underground tanks does not foreclose recovery by AFA under other theories of liability.

### Count V (Contractual Indemnity)

 "The guiding light in the construction of a contract is the intention of the parties as expressed by them in the words they have used, and courts are bound to say that the parties intended what the written instrument plainly declares." *W.F. Magann Corp. v. Virginia–Carolina Electric Works Inc.*, 203 Va. 259, 123 S.E.2d 377, 378 (1962). AFA contends that it should be allowed to recover against Exxon under the indemnity provisions of section thirteen of paragraph two of the lease between its and Exxon's predecessors. The pertinent language reads:

> After [Exxon] takes full possession of said premises, [Exxon] covenants and agrees to indemnify and save [AFA] harmless from any and all claims, demands, suits, actions, judgments and recoveries for or on account of damage or injury (including death) to property or person of [Exxon], its agents, servants, or other party or parties caused by or due to the fault or negligence of [Exxon], its sublessee and assigns in the operation of the service station.

AFA alleges that the phrase "other party or parties" is ambiguous and, as a matter of contract interpretation, inappropriate for summary judgment. The Court finds no such ambiguity. Plainly read, the section provides indemnity for damage to property of Exxon, to property of its agents and servants, and to property of third parties. Damage claimed by AFA to its own property is not covered. Thus, AFA may not recover against Exxon under this contractual provision for damages not asserted by third parties.

### *Conclusion*

For the reasons stated here, this Court concludes that the Supreme Court of Virginia would find that storage and removal of gasoline from underground storage tanks are not abnormally dangerous activities for which common law strict liability should be imposed. Furthermore, the plain language of the indemnity provision of the lease excludes recovery by AFA for damages sustained by its own property. Exxon's Motion for Partial Summary Judgment as to Counts II and V of Amended Complaint should be, and hereby is, GRANTED.