## CIRCUIT COURT OF FAIRFAX COUNTY

Stockbridge Community
Association et al.

v.

Star Enterprise et al.

January 27, 1992

Case No. (Law) 108514

BY JUDGE THOMAS S. KENNY

This case came on to be heard on the demurrer of all defendants to Counts One through Six of Plaintiffs' Motion for Judgment. Count One alleges strict liability. Count Two alleges violation of the state water control law. Count Three alleges negligence. Counts Four and Five allege nuisance. Count Six alleges trespass. Defendant Edward Fencil also filed a demurrer to the entire action against him.

For the reasons set forth below, the demurrer to Count One is sustained; the demurrers to Counts Two and Three are overruled; the demurrers to Counts Four and Five are sustained with leave to have them transferred to the chancery side of the court; and the demurrer to Count Six is sustained with leave to amend within 21 days of the date of this letter. The demurrer as to the action against Edward Fencil is also sustained with leave to amend within the same period.

For purposes of the demurrer, I will take the facts as alleged in the motion for judgment to be true. *Fox v. Deese*, 234 Va. 412 (1987). They are, in condensed form, as follows.

The Star Washington Sales Facility is a petroleum storage and distribution facility located on a tank farm which is approximately 20 acres in area at the intersection of Pickett Road and Colonial Avenue in the City of Fairfax, Virginia. It consists of a one-story office building, a warehouse, nine above-ground storage tanks with a total storage capacity of 17,261,202 gallons, eleven underground storage tanks with a total storage capacity of 41,084 gallons, and a petroleum products truck loading rack. Immediately underlying the Star Washington Sales facility is an unconfined ground water table. The ground water table is part of a regional watershed that runs throughout the nearby residential communities and empties into local creeks and, eventually, the Potomac River. Plaintiffs are the owners or residents of neighboring properties.

On October 26, 1990, Star Enterprise reported that a petroleum release had occurred at its facility. A subsequent subsurface investigation using testing wells revealed that as much as seven feet of free petroleum product was floating on the surface of the ground water beneath the Star Washington Sales Facility and had migrated off-site onto both public and private properties and into Crook Branch Creek. At the time the product was discovered and today, the width, breadth, and speed of the product plume is unknown.

The oil leak resulted in the release of, at a minimum, hundreds of thousands of gallons of oil into the ground. Oil has saturated many acres of soil and migrated to the underground water table, where it has spread and continues to spread over many acres underground. Significant concentrations of petroleum vapors have been found in the storm drain system passing through Stockbridge and Mantua, where most of the Plaintiffs reside.

Plaintiffs allege that the contamination of soil and water resulting from the leak has served to diminish or destroy the value of their property and has impacted on their health. The Plaintiffs also allege that the clean-up activity has created a nuisance to adjoining property owners. Finally, the Plaintiffs allege a continual risk of harm to their health, property, and community.

I. *Count One: Common Law Strict Liability*

Strict liability is applied when an activity is deemed to be abnormally dangerous, i.e., is "dangerous in its normal or nondefective state." *Arlington Forest Associates v. Exxon Corp.*, Civil No. 91–0369-A, slip op. p. 17 (E.D. Va. 1991). Strict liability does not mean

that the activity is prohibited, but it does mean that the one carrying on the activity will be held responsible for all damages to another resulting from the activity, without the necessity of showing negligence on the actor's part.

The paradigm of strict liability in Virginia is the blasting case. *See, M.W. Worley Construction Co. v. Hungerford, Inc.*, 215 Va. 377 (1974); *Laughton & Johnson, Inc. v. Burch*, 222 Va. 200 (1981). Even with the exercise of due care, the consequences of blasting rock with dynamite are so unpredictable and uncontrollable that blasters are held strictly liable for them.

The Virginia Supreme Court has been reluctant to expand the concept to other situations. See, e.g., *Philip Morris, Inc. v. Emerson*, 235 Va. 380 (1988) (handling of highly toxic gas); *Daniel v. Kosh*, 173 Va. 352 (1939) (storage of gasoline at service station); *Epperson v. DeJarnette*, 164 Va. 482 (1935) (sawmill); *Norfolk & W. Ry. Co. v. Johnson*, 207 Va. 980 (1967) (transporting steam). No Virginia case has dealt with the issue of strict liability in a tank farm context. However, in the *Hungerford* case, the Supreme Court adopted the *Restatement of Torts* test for strict liability, and accordingly, this case should be analyzed on that basis.

Section 520 of the *Restatement* (2nd) lists six factors to be weighed in determining whether an activity is abnormally dangerous: the existence of a high degree of risk of some harm to the person, land or chattels of others; a likelihood that the harm that results from it will be great; an inability to eliminate the risk by the exercise of reasonable care; the extent to which the activity is not a matter of common usage; the inappropriateness of the activity to the place where it is carried on; and the extent to which its value to the community is outweighed by its dangerous attributes.

In their motion for judgment, Plaintiffs have carefully tracked these factors by alleging that the storage and distribution of petroleum products "adjacent to a heavily populated residential area and in close proximity to a source of drinking water" violated each of the *Restatement* standards. No specific facts have been alleged to support these conclusory allegations, but it is apparent that the location of the tank farm near a residential area is an important factor to both sides, since so much attention was paid to it in briefs.

I do not agree that the density of population in the vicinity of the bank farm is the determinative factor. If an ongoing activity is ultra-

hazardous, it seems to me that it would be so whether many families or only a few are affected. Rather, I believe that the key factor in this case is whether the obvious risks associated with the storage of this much gasoline can be eliminated by the exercise of due care. In this context, "eliminated" cannot mean "beyond the realm of possibility," for under such an interpretation, simply operating an automobile would be a matter of strict liability. I agree with Judge Ellis' opinion in *Arlington Forest* that the risk must be reducible by due care to a point where the likelihood of harm is no longer high. *Arlington Forest Associates v. Exxon Corp, supra* at p. 9.

This factor seemed to be the key for the court in *Philip Morris, Inc. v. Emerson, supra.* In that case, the court dismissed out of hand a strict liability claim based on the release into the atmosphere of a lethal gas. Without any apparent evidence in the record to support the conclusion, the court stated that all the defendants "had the ability to eliminate the risk of injury by exercising reasonable care." *Id.* at 406.

Two important points can be derived from this part of the *Philip Morris* case. The first is that, notwithstanding the *Restatement* position, that each of the factors is to be "weighed," the Virginia Supreme Court uses as a threshold determination the single factor of whether the risk can be eliminated by the exercise of reasonable care. If it can be, then the other factors will not even be considered.

The second point is that the court appears to have determined for itself as a matter of law that reasonable care would eliminate the risk, rather than to have relied on any factual evidence in the records. In other words, it is not necessary to submit an issue of strict liability to a jury simply because the claim is made.

In the absence of any specific allegations as to why this tank farm could not be made safe by the exercise of reasonable care, I will look at the fact that our society has tank farms all over the place that do not leak like this one and hold as a matter of law that reasonable care could have prevented this catastrophe. The demurrer to Count One is sustained.

II. *Count Two: Violation of the State Water Control Law*

Plaintiffs alleged that the Defendants are operators of a facility from which there has been a discharge of oil into and upon Commonwealth waters, land, and storm drain systems. Plaintiffs also allege

that as a proximate result of the discharge, Plaintiffs have suffered injury and damage to their persons and properties.

Section 62.1–44.34:18(C) of the Code of Virginia (Supp. 1990) reads, in part, as follows:

> Any person discharging or causing or permitting a discharge of oil . . . which may reasonably be expected to enter state waters, or causing or permitting a substantial threat of such discharge and *any operator of any facility from which there is a discharge* . . . shall be liable to . . . [*a*]*ny person* for injury or damage to person or property, real or personal, loss of income . . . or loss of the use of the damaged property . . . caused by such damage.

(Emphasis added.)

Thus, the Plaintiffs have alleged exactly what is required by the statute to assert a cause of action under this statute.

Defendants argue that Plaintiffs have not shown that the leak occurred while they operated the facility, but this ignores the allegation that the discharge is continuing and that some part of it occurred during Defendants' operation. Even if it were the case that the discharge occurred prior to Defendants' use of the facility, federal courts have construed responsible parties under analogous statutes to include present operators of facilities from which there have been past discharges. *See, e.g., Tanglewood East Homeowners v. Charles-Thomas, Inc.*, 849 F.2d 1568, 1572 (5th Cir. 1988).

Defendants also argue that the statute does not apply to mere operators of a facility, but this argument contradicts the plain language of the statute quoted above.

Finally, Defendants argue that the statute does not provide a private cause of action and that therefore the Plaintiffs lack standing to raise this claim. However, the statute says the operator "shall be liable to . . . [a]ny person" who suffers injury, and it is difficult to interpret this language any way other than to provide a private cause of action.

Therefore, the demurrer to this count is overruled.

III. *Counts Three through Five: Negligence and Nuisance*

Plaintiffs claim that defendants were negligent in the operation of their facility. They also claim that the defendants operate a nuisance,

both public and private.[1] Defendants, relying on the case of *Philip Morris, Inc. v. Emerson, supra*, wish to require the plaintiffs to elect between maintaining a negligence action or a nuisance action.

In *Philip Morris*, a deadly gas escaped from defendant's premises, and the adjoining campground was evacuated as a precaution. The campground owner's claim for negligent interference with its contractual relationships with its campers could not be sustained because there was no evidence that any of the gas actually intruded onto the plaintiff's property. Therefore, the plaintiff attempted to achieve the same result by claiming monetary damages for nuisance. The Supreme Court held that where the same conduct that constitutes nuisance also constitutes negligence, the rules of negligence will apply, and thus the nuisance claim was also barred. In other words, one cannot use a nuisance vehicle to advance a negligence claim for money damages.

*Philip Morris* is not directly apposite here, since there is no basis for arguing that plaintiffs' nuisance claim is merely a front to avoid some limitation on a negligence action. However, I believe it does stand for the proposition that where the same conduct represents both negligence and nuisance, the negligence claim for money damages is the one that will go forward. There is no need to go forward on both, since the same conduct would be proved and there can be but one recovery. *See generally, Terrell v. C & O Ry. Co.*, 110 Va. 340, 344 (1909); *So. Ry. Co. v. McMernaming*, 113 Va. 121 (1912) (where the courts found nuisance in the absence of negligence).

*Philip Morris*, and the cases on which it relied, involved an effort by the plaintiff to recover money damages for nuisance where they could not be awarded in negligence. It should not be read to apply more broadly than that. In this case, for example, the main thrust of plaintiffs' claim in nuisance is to obtain injunctive relief. This type of claim does not belong in a law action. *See, Wright v. Castles*, 232 Va. 218, 222 (1986). To the extent that Counts Four and Five seek

---

[1] "Nuisance" can arise from the use of one's property either negligently or through willful misconduct. There is no allegation of willfulness in Counts Four or Five. The only conduct alleged to give rise to nuisance is the same conduct alleged to be negligence in Count Three.

injunctive relief, therefore, they should be transferred to the equity side of the court.[2]

However, to the extent that both the negligence and nuisance claims seek money damages, defendants argue that the plaintiffs should be required to elect which of these remedies they will seek. I read *Philip Morris* as going further than that. I believe it effective limits plaintiffs to a negligence claim.

> Where the acts or omissions constituting the negligence are the identical acts which it is asserted give rise to a cause of action for nuisance, the rules applicable to negligence will be applied.

235 Va. at 402.

If the same conduct is to be proved as in Count Three and the same rules are to be applied as in Count Three, then it makes no difference what name the plaintiffs attach to Counts Four and Five. Those counts do not pass the "duck test"[3] and will be struck from the law action, without prejudice to the plaintiffs' right to assert them in a proper equity case.

IV. *Count Six: Trespass*

Plaintiffs allege that petroleum was leaked onto their property, which they also allege resulted in harm to their property. Thus, in the case of most of the Plaintiffs, it is apparent that the elements of trespass have been set forth. However, two of the Plaintiffs, the Baers, are alleged to live in McLean, far from the oil spill, and there is no indication how their property has been trespassed upon. The defendants are entitled to know where plaintiff Baers' property is located and how it has been trespassed upon. Thus, the demurrer as to this count is sustained with leave to amend.

V. *Demurrer of Edward Fencil*

The demurrer of Edward Fencil is sustained on the negligence and trespass counts because insufficient facts have been alleged to deter-

---

[2] This does not necessarily mean that the law case and the chancery case cannot be tried together, since each relies substantially on the same proof. To the extent that proof is to be offered in the chancery case which is irrelevant or otherwise inadmissible in the law action, it could be heard outside the presence of the jury. This is a decision that can be made once the trial issues have been determined.

[3] If it looks like a duck, and walks like a duck, and quacks like a duck, it is a duck.

mine that Mr. Fencil knew or should have known of the leakage, that he personally breached any of his responsibilities, or that he owed a personal duty to the Plaintiffs. I agree with the authorities cited by Fencil that in the absence of some direct involvement by him, he will not be liable for the torts of his employer. *See also, Miller v. Quarles*, 242 Va. 343, 410 S.E.2d 639 (1991). Contrary to plaintiffs' protestations, no such personal involvement is alleged in the motion for judgment. Accordingly, Fencil's demurrer as to Counts Three and Six[4] is sustained.

A somewhat more difficult question is whether Fencil should be held strictly liable under the State Water Control Law count (Count Two). The statute defines an "operator" as:

> any person who owns, operates, charters, rents or otherwise exercises control over or responsibility for a facility or a vehicle or vessel.

§ 62.1–44.34:14 (Supp. 1991).

The issue here is whether a general manager is an "operator" of the facility within the scope of the foregoing definition. There is no question that Fencil's employer, Star Enterprise, is such an operator. Can there be more than one operator? If so, why stop at the general manager? Why not make each assistant general manager, each shift supervisor, and each maintenance foreman also responsible? For that matter, why not make Mr. Fencil's immediate supervisor, and his or her immediate supervisors all the way up to the Chairman of the Board of Texaco, personally liable?

If Mr. Fencil personally participated in the events leading up to this catastrophe, he can be held personally liable under § 62.1–44.38:18(c) as a "person discharging or causing or permitting a discharge of oil into or upon state waters . . . ." But I do not believe it is an appropriate reading of the statute to hold that an employee with supervisory responsibility is, solely by virtue of such status, an "operator" of the facility for purposes of strict liability against him personally.

The demurrer of Mr. Fencil is therefore sustained, with leave to amend.

---

4 The demurrers of *all* defendants to Counts One, Four, and Five have previously been sustained for other reasons, *supra.*